**Matthew S. BENTO**

v.

**I.T.O. CORPORATION OF RHODE ISLAND.**

**Civ. A. No. 83–0100 S.**

United States District Court, D. Rhode Island.

Dec. 12, 1984.

733

Cooper Associates, David A. Cooper, Providence, R.I., for plaintiff.

Gaston Snow & Ely Bartlett, Douglas F. Seaver, Glynn & Dempsey, Thomas J. Muzyka, Boston, Mass., Charleson & Brill, Marvin A. Brill, Providence, R.I., for defendant.

## MEMORANDUM AND ORDER

SELYA, District Judge.

Matthew Bento, a sixty-three year old longshoreman with over thirty-six years of experience on the docks, has brought this action alleging, inter alia, handicapped discrimination under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–796i, (more specifically, for purposes of this case, § 793 and § 794). The defendant, I.T.O. Corporation of Rhode Island (ITO), is one of the five cargo-handling companies which collectively comprise the Rhode Island Shipping Association (Association). The Association, which also includes Goff and Page, Inc., John J. Orr & Son, J.F. Moran, and Tidewater Terminals (previously Patriot Metal), is the united front by which these firms manage their relations with the International Longshoremen's Association, Local No. 1329 (Union) and with the Union members who perform needed longshoring functions.

The instant action combined claims triable by jury with claims triable to the court. The nature of these contentions is more fully delineated *post.* The court, with the concurrence of the parties, tried the jury and non-jury claims ensemble (October 23, 24, 25, 26, 1984), permitting supplementation of the record after conclusion of the jury portion of the trial. Post-trial briefs were submitted as to the claims tried to the court. And, this rescript constitutes the court's findings of fact and conclusions of law thereon, in pursuance of Fed.R.Civ.P. 52(a).

## I. Facts.

In 1977, while working in a drive-on/drive-off job on a ship, Bento suffered a back injury. Unable to work, he received workers' compensation until the Fall of 1978; in October of that year, he applied

for disability benefits and was granted an award of such benefits to start in June, 1979.

On January 7, 1979, however, Bento was admitted to Miriam Hospital complaining of chest pains. He remained in the hospital for six days and was released. This medical reprieve was short-lived, however, as he was subsequently readmitted with the same symptomatology on January 29, 1979. On February 13, Bento underwent coronary cineangiography and cardiac catheterization, which demonstrated that he had only two major arteries instead of the normal three. He was discharged shortly thereafter on a regime of medical therapy. On August 4, 1979, he was again hospitalized because of unstable symptoms of angina. Several days later, doctors performed urgent open-heart single bypass surgery.

Despite the severe setback, Bento—an earnest, plain-spoken individual who impressed the court with his grit, determination, and unwillingness to surrender to the onslaught of physical infirmity—made it plain from the beginning that he regarded his condition as temporary and intended to return to work as a longshoreman when possible. On September 10, 1979, he wrote to the Board of Trustees of the pension fund, which is jointly maintained by the Association and by the Union, concerning a disability pension. On October 4, he was informed that a pension of $425 per month, effective retroactive to May of 1978, had been granted. The trustees also arranged for life insurance coverage to be extended to the plaintiff. Evidently concerned about the strings attached to his pension, Bento sent a registered letter, dated October 15, 1979, to the chairman of the Union's seniority board. In pertinent part, the letter read, "My notice of my involuntary retirement received today so I am making a formal request to the Seniority Board...— [for] a leave of absence of at least one year and at most, two years." Copies of the letter were also sent to the Association's president and to Leonard J. Stanton. While the plaintiff acknowledged that he had sent Stanton the letter because of Stanton's role as secretary of the Associa-

tion, it is well to note that Stanton's primary employment was as ITO's general manager in Providence. Stanton was also a trustee of the jointly-run ILA/Association pension trust.

By mid-1981, Bento had begun unilateral preparations to return to work. On May 29, 1981, the U.S. Social Security Administration answered his request for clarification of his standing by informing him that he was entitled to a trial work period during which his disability benefits would still be paid. Bento attended a Union meeting on July 14 and announced that he would be returning to work in the Fall. As there seems to have been some confusion about his Union membership status, he memorialized his intentions in a letter dated July 22 addressed to the Union's president (Gomes). The plaintiff also requested that Gomes tell him whether he needed to take any other action to clear the decks for his anticipated return to work. On August 7, 1981, Bento wrote to inquire what disposition would be made of his life insurance when he returned to work in the Fall. On August 12, Philip Campana, the Association's executive director, answered this letter and explained that the plaintiff's question would be presented to the trustees at their next meeting. Despite all this evidence of Bento's intentions, however, neither the Union, nor the Association, nor the companies individually, responded to the specific issue of his returning to work.

Nothing daunted, Bento steamed ahead. On October 5, 1981, he appeared at a "shape-up," clamoring for work. Because the question of who actually does the hiring has become an issue in this litigation, a brief explanation as to how work is distributed on the docks is in order. There are five permanent gangs which share all the general cargo work in the port of Providence. The gangs are not identified with any particular employer; each employer's work is parceled out among all the crews, with the gang having the lowest number of hours worked being given priority, and so on, up the ladder. Within each gang, positions are assigned by seniority. If less

than the full gang complement is needed, drop-outs are determined on a reverse seniority basis. If a permanent gang member is absent on a particular day, his replacement is selected—again, by seniority—from the pool at that day's shape-up. On a daily basis, the size of the pool depends on how many longshoremen choose to turn out. The quantity of available work relates to the number of ships in port on that day, and the complement needed to load and/or unload those ships. Basically, then, the companies indicate their manpower needs, while the Union assigns the work.

When Bento appeared at the October 5 shape-up after a four-year absence from the docks, he was picked as a fill-in member of a permanent gang that had been designated to work on the Kanuka Forest, a lumber ship being unloaded by ITO. Shortly after the plaintiff had reported to the vessel, Stanton approached him on deck. ITO's general manager was well aware that the plaintiff had been receiving a disability pension, and promptly inquired whether he had medical clearance to work. When Bento's response proved unsatisfactory, Stanton ordered him off the ship.

The evidence was sharply conflicting concerning the phraseology which Stanton employed on this occasion. The plaintiff, and several other longshoremen, claimed that Stanton "fired" Bento, without mincing words. Stanton, on the other hand, said that he merely refused to ratify plaintiff's engagement by the Union. While the parties apparently view choice of language anent this point as being of consequence in terms of the Rehabilitation Act, the court declines the invitation to become mired in such a philological bog.

Whatever the mechanics of the hiring scheme, ITO plainly had—and exercised—plenary authority to prevent Bento from working its ships. ITO's argument that it was technically uninvolved in the hiring process is a lame attempt to elevate the form of the shape-up over the substance of the dock-side workplace. The Act itself advocates that federal contractors "shall take affirmative action to employ and ad-vance in employment qualified handicapped individuals," 29 U.S.C. § 793, and focuses in pertinent part on the exclusion of individuals from employment "solely by reason of ... handicap." *Id.* at § 794. The relevant policy underlying the Rehabilitation Act is clear: "to promote and expand employment opportunities in the public and private sectors for handicapped individuals." 29 U.S.C. § 701(8). And, the very essence of an employment relationship—the exchange of services rendered under the control of another for recompense by such other—is starkly present in terms of the juxtaposition of cargo-handling firms vis-a-vis wharf hands. The Act and the economic realities of the situation coalesce to undermine the wordmongery of the defendant. To the extent (if at all) that the reach of the Act extends to Bento's plight, the question of whether he was discharged or simply excluded from the chance of employment is immaterial. ITO's exercise in semantics is, at bottom, a distinction which wanders fruitlessly in search of a difference.

Following the announcement of Stanton's embargo, Bento left the vessel. He returned with a physician's slip which he presented, in the first instance, to Gomes. The note, dated September 14, 1981 and signed by Dr. Abraham Saltzman, read in its entirety as follows:

> Permission given to return to light work involving no more than 2 flight [sic] climbing at time.

Gomes delivered the note to Stanton, who did not find it to be an adequate medical clearance. He persisted in his refusal to allow Bento to work as a longshoreman for ITO. Accordingly, Gomes told Bento that same day that he would have to submit better documentation of his putative fitness to return to work. On October 10, another Union official, Barry O'Connor, informed Bento that he would have to be examined by a physician before he would be allowed to toil as a longshoreman.

On October 27, 1981, at the Association's request, Bento was examined by Dr. Patrick J. Brannon. Dr. Brannon's evaluation was contained in a letter to the Association

dated November 12, 1981 and received by the parties in interest shortly after that date. Dr. Brannon's report summarized the history, findings, and test results, and concluded:

> ... that Mr. Bento was quite asymptomatic following his coronary artery bypass graft surgery. His experience on the treadmill would suggest that with appropriate medicines such as a selective cardiac beta blocker and attention to his blood pressure, he may well return to work.

Though the Association had arranged for Dr. Brannon to examine the plaintiff, it eschewed passage of judgment after receiving the physician's report. Instead, copies of the document were sent by the Association to all member companies, including the defendant. Each stevedoring contractor was left to decide for itself whether or not the plaintiff was fit for duty.

In the interim, Bento arranged to be taken off the disability pension rolls, effective in January of 1982. He continued to appear at shape-ups, and was allowed to work for an Association member, John J. Orr & Son, in late January or early February of that year. Since that time, he has worked as a longshoreman for every member company of the Association (except ITO). The defendant has held firm, adamantly denying him the right to work its ships unless and until more definitive medical clearance has been received. Despite this prohibition, Bento has attended every ITO shape-up and, of course, has been excluded from the gangs. During the two and a half years since he returned to work as a longshoreman, the plaintiff's work record has been good: he has missed only three weeks, and there was no evidence of any untoward incidents.

Notwithstanding his access to the workplace through the other members of the Association, Bento has not taken his rejection by ITO lightly. On October 16, 1981,

he filed a complaint with the National Labor Relations Board, alleging a conspiracy between ITO and the Union to deprive him of his seniority and to force him to "quit the Union." This initiative was later withdrawn without prejudice at the plaintiff's request. On April 1, 1982, he filed charges of age and handicapped discrimination against ITO with the Providence Human Relations Commission. The Commission held a fact-finding meeting on April 26, and the parties agreed that Bento would be examined yet again. Dr. Kenneth Nanian was appointed to conduct the examination. The plaintiff, however, declined to await the results of this screening; on May 11, 1982 he launched a new attack on a pair of fronts: he simultaneously filed charges of age discrimination with the Equal Employment Opportunity Commission (EEOC) and charges of handicapped discrimination with the Office of Federal Contract Compliance Programs (OFCCP) of the U.S. Department of Labor. The EEOC referred Bento's age discrimination complaint to the Rhode Island Commission for Human Rights; before any findings were made, the age discrimination charge was withdrawn at the plaintiff's request.[1] The OFCCP seasonably commenced what would prove to be a protracted investigation into the handicap claim.

The next significant development transpired on November 15, 1982, when Dr. Nanian saw Bento in pursuance of the earlier agreement. Incidental to that examination, a treadmill exercise test was performed on November 29, and a resting exercise gated heart pool scan was done on November 30. Roentgenologic and blood screening studies were obtained. Dr. Nanian reviewed Bento's hospital records in part, but was careful to note that certain materials were not made available for his perusal. On January 17, 1983, Dr. Nanian forwarded his report concluding that:

> Mr. Bento undoubtedly has arteriosclerotic heart disease and angina pectoris.

---

**1.** Bento did, however, receive a right-to-sue letter in regard to that claim under date of November 4, 1982.

At the present time his angina and left ventricular dysfunction appears to occur at a fairly high level of effort. Therefore, it is quite reasonable to assume that Mr. Bento can safely continue to work at a job which does not require exertion which would raise his pulse rate to a level greater than 120 beats per minute. This would appear to offer a very safe margin from the heart rate of 170 to 180 which was required to precipitate symptoms during his stress tests. At the lower level of exercise his electrocardiogram remained at baseline levels and he exhibited no symptoms. Likewise, the abnormalities in the gated heart pool scan occurred at a heart rate of 160 and a peak blood pressure of 200/104 after 14 minutes and 50 seconds of strenuous effort. Such an effect should be minimal at the lower heart rate.

At some point thereafter (not precisely established in the evidence before this court), the Providence Human Relations Commission found no probable cause to support Bento's charge of age and handicapped discrimination. The OFCCP, relying in part on Dr. Nanian's report, concluded that there had been no discrimination by ITO under 29 U.S.C. § 793.

The evidence in this case is also instructive for what it does *not* show. There is nothing to indicate, for example, the basis on which the other members of the Association elected to allow Bento to work from early 1982 on. The plaintiff offered no proof in this regard, and the court cannot say what (if any) medical information or advice was available to any or all of those firms. And, the evidence is meagre as to the precise nature of the tasks which the plaintiff undertook in those employments.[2]

The record is similarly devoid of any evidence which permits a direct correlation between the findings and opinions reported by Dr. Saltzman, Dr. Brannon, and Dr. Nanian and the nature of the duties customarily incident to longshoring work. None of these physicians testified.[3] Yet, it is plain from the testimony that a longshoreman's lot entails a substantial amount of arduous and physically demanding work. In the performance of the usual and ordinary functions normally incident to the job, heavy lifting, bending and climbing are all required. The position demands great exertional effort, strength, stamina, endurance, and agility. While the plaintiff and some of his witnesses attempted to minimize the physical components of longshoring work in this technologically advanced age, the court found the defendant's evidence on the point—particularly that of Captain Groom (ITO's vice-president and a veteran of more than three decades in the industry)—far more persuasive.[4]

## II. Posture of the Litigation.

Bento filed suit in this court in early 1983, alleging that ITO had violated both

2. There was testimony that Bento's labors for Orr, his principal source of work during the period, were largely confined to service in a supervisory capacity (as a "walking foreman"). The court credits this testimony. A walking foreman is a straw boss of sorts, and not a member of the longshoring gang per se. Both the testimony in the case and the definitive dockside labor contract between the Union and the Association (the Working Agreement) indicate that, unlike other job assignments, the cargo-handler has the right to nominate and select such persons from within the Union membership. The custom calls for a single walking foreman per vessel. The Working Agreement, Art. VIII § 8, further protects the employer's right to designate the walking foreman by insisting that no longshoreman so designated may be employed in that same capacity by another employer (except in an emergency). If an employee has been designated as a walking foreman by one stevedoring contractor, however, he may work as a member of a permanent gang, or as a roustabout dockhand, for other companies.

3. The only live medical evidence presented at the trial was given by Dr. David Kitzes (a respected cardiologist who had been instrumental in Bento's care during his hospitalization for coronary problems) and Dr. Elliot Sagall (an internist who testified as an expert witness for the defense without the benefit of any actual examination of the plaintiff).

4. Further findings of fact are contained in the court's analysis of legal issues. *See* text *post* at Part III.

the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1) (count one) and the Rehabilitation Act, 29 U.S.C. §§ 793, 794 (count two), when it refused to hire him on October 5, 1981. The plaintiff demanded a jury trial on the ADEA count, as was his due. As previously noted, *see* text *ante*, the two counts were tried jointly. At the conclusion of all of the evidence anent the age discrimination claim, the court directed a verdict for the defendant, Fed.R.Civ.P. 50(a), holding that, as a matter of law, the plaintiff had entirely failed to carry his burden of proving that ITO had discriminated against him because of his age and that no viable jury question had been made out on the ADEA count. The court then took supplemental evidence on the judge-tried handicapped claims. Decision was reserved.

It should be noted that, after the plaintiff had rested and much of the defense case had gone in, Bento's counsel moved under Fed.R.Civ.P. 15 to change the thrust of his claims from a single incident theory (*i.e.*, that a prohibited act had occurred on

October 5, 1981) to a continuing violation theory.[5] The defendant objected. The court, finding merit in ITO's claim of unreasonable delay and likely prejudicial effect, sustained the objection as to the ADEA count. But despite ITO's like protestations as to the handicapped discrimination claims, the court permitted that count to be amended. (Inasmuch as the jury was not involved in deciding count two, the court was able to attach conditions to the amendment which, in the court's view, afforded suitable prophylaxis to ITO; the presence of the jury did not permit the same lenity as to the first count). Thus, the claims presently sub judice are before the court in their amended (continuing violation) incarnation.[6]

III.  Plaintiff's Claims Under The Rehabilitation Act.

A.  *The 29 U.S.C. § 793 Claim*

■  The court need not tarry unduly in its consideration of the plaintiff's claim under § 503 of the Rehabilitation Act, 29 U.S.C. § 793.[7]  Federal appellate tribunals

---

**5.** The continuing violation thesis, which had its genesis in Title VII law, has been discussed at great length by appellate tribunals, *e.g., Delaware State College v. Ricks,* 449 U.S. 250, 257–58, 101 S.Ct. 498, 503–04, 66 L.Ed.2d 431 (1980); *United Air Lines v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977); *Velazquez v. Chardon,* 736 F.2d 831, 833 (1st Cir. 1984); *Jones v. Somerville,* 735 F.2d 5, 7 (1st Cir.1984), and no worthwhile purpose would be served in this case by extended dissertation on the ramifications of the theorem.

**6.** Notwithstanding the court's express order, when the plaintiff's counsel filed the further amended complaint, he included a continuing violation claim in respect to the ADEA. That filing, whether the product of deviousness or of ignorance, is a nullity. Accordingly, count one of the further amended complaint is stricken in conformity with the court's order of October 26, 1984.

**7.** 29 U.S.C. § 793 provides in material part:
§ 793. Employment under Federal contracts (a) Amount of contracts or subcontracts; provision for employment and advancement of qualified handicapped individuals; regulations. Any contract in excess of $2,500 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services (including construc-

tion) for the United States shall contain a provision requiring that, in employing persons to carry out such contract the party contracting with the United States shall take affirmative action to employ and advance in employment qualified handicapped individuals as defined in section 706(7) of this title. The provisions of this section shall apply to any subcontract in excess of $2,500 entered into by a prime contractor in carrying out any contract for the procurement of personal property and nonpersonal services (including construction) for the United States.
(b) Administrative enforcement; complaints; investigations; departmental action. If any handicapped individual believes any contractor has failed or refuses to comply with the provisions of his contract with the United States, relating to employment of handicapped individuals, such individual may file a complaint with the Department of Labor. The Department shall promptly investigate such complaint and shall take such action thereon as the facts and circumstances warrant, consistent with the terms of such contract and the laws and regulations applicable thereto.
This provision is part of the same Act as § 504, 29 U.S.C. § 794, but must be distinguished from it. Section 504 provides in pertinent part as follows:

have been consentient in holding that § 503 does not provide a private right of action. *See, e.g., Hodges v. The Atcheson, Topeka and Santa Fe Railway Co.*, 728 F.2d 414, 416 (10th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984) *Ernst v. Indiana Bell Telephone Co., Inc.*, 717 F.2d 1036, 1038 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984); *Painter v. Horne Bros., Inc.*, 710 F.2d 143, 144 (4th Cir.1983); *Meyerson v. Arizona*, 709 F.2d 1235, 1238 (9th Cir. 1983), *vacated on other grounds,* —— U.S. ——, 104 S.Ct. 1584, 80 L.Ed.2d 118 (1984); *Davis v. Ohio Barge Line, Inc.*, 697 F.2d 549, 556 (3rd Cir.1983); *Davis v. United Air Lines, Inc.*, 662 F.2d 120, 122–27 (2d Cir.1981), *cert. denied,* 456 U.S. 965, 102 S.Ct. 2045, 72 L.Ed.2d 490 (1982); *Simon v. St. Louis County*, 656 F.2d 316, 319 (8th Cir.1981); *cert. denied,* 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982); *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074, 1078 (5th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980); *Hoopes v. Equifax, Inc.*, 611 F.2d 134, 135 (6th Cir. 1979). Although the plaintiff has cited a number of district court opinions in support of his asseveration that § 503 can be used as a springboard for a private suit, these authorities are unpersuasive. Both *California Paralyzed Veterans Association v. FCC*, 496 F.Supp. 125 (C.D.Cal.1980), *aff'd on other grounds*, 721 F.2d 667 (9th Cir. 1983), and *Hart v. County of Alameda*, 485 F.Supp. 66 (N.D.Cal.1979) have been preempted by the Ninth Circuit's later decisions in *Meyerson* and in *Fisher v. Tucson*, 663 F.2d 861 (9th Cir.1981), *cert. denied,* 459 U.S. 881, 103 S.Ct. 178, 74 L.Ed.2d 146 (1982), which hold squarely that there is no private right of action under § 503. Like-

wise, *Chaplin v. Consolidated Edison Co.*, 482 F.Supp. 1165 (S.D.N.Y.1980) has been superseded in its own circuit by *Davis v. United Air Lines, Inc., supra. Drennon v. Philadelphia General Hospital*, 428 F.Supp. 809 (E.D.Pa.1977) has been similarly decimated by *Davis v. Ohio Barge Line, Inc., supra,* and by *Beam v. Sun Shipbuilding & Dry Dock Co.*, 679 F.2d 1077 (3rd Cir.1982). Most recently, the Tenth Circuit's decision in *Hodges, supra,* has cut the ground from under *Davis v. Modine Manufacturing Co.*, 526 F.Supp. 943 (D.Kan.1981).

The reasoning of the several circuits is unassailable. The statutory language does not imply on its face any intention to endow handicapped persons who suffer from the adverse effects of discrimination with a direct right of action; rather, § 503 is unmistakably structured as a directive to federal agencies. And, the legislative history furnishes no support for Bento's attempt to read a private antidiscrimination component into the law. *E.g.,* S.Conf.Rep. No. 93–1270, 93d Cong.2d Sess. (1973). *See Rogers*, 611 F.2d at 1079 n. 5. To infer the existence of a neoteric right of action under § 503 would require this court to jettison the weight of authority, to usurp the legislative role of the Congress, and to adhere to the now thoroughly discredited and outdated view once expressed by a handful of district courts. That would be strong—and distasteful—medicine indeed; and this court abjures any role in filling such a prescription.

Count two of the plaintiff's complaint, insofar as it implicates § 503, cannot serve as a vehicle to redress the alleged wrongs. Bento's contentions in this wise are meritless.[8]

---

§ 794. Nondiscrimination under Federal grants and programs; promulgation of rules and regulations. No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or

activity conducted by any Executive agency or by the United States Postal Service....

8. The OFCCP has authority for administration of this section and has promulgated regulations. *See* 41 C.F.R. § 60–741 (1978). Bento has, as previously observed, initiated an OFCCP proceeding by the filing of a complaint. The agency, after a complete investigation, adjudged his protestations of discrimination to be without foundation. In light of the conclusion reached herein, the court need not deal with the ques-

## B. *The 29 U.S.C. § 794 Claim*

Neither the Supreme Court nor the First Circuit has specifically determined whether a private right of action exists under § 504 of the Rehabilitation Act, 29 U.S.C. § 794. *See Consolidated Rail Corp. v. Darrone,* — U.S. —, 104 S.Ct. 1248, 1252 n. 7, 79 L.Ed.2d 568 (1984); *Southeastern Community College v. Davis,* 442 U.S. 397, 404–05 n. 5, 99 S.Ct. 2361, 2366 n. 5, 60 L.Ed.2d 980 (1979); *Smith v. Cumberland School Committee,* 703 F.2d 4, 9 (1st Cir.1983), *aff'd, sub nom, Smith v. Robinson,* — U.S. —, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984); *Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency,* 649 F.2d 71, 75 n. 6 (1st Cir.1981). The First Circuit has, however, been willing to assume without deciding that a private right does exist. *See Hurry v. Jones,* 734 F.2d 879, 886 (1st Cir.1984) (relying in part on *Consolidated Rail Corp., supra*); *Rhode Island Handicapped Action Committee v. Rhode Island Public Transit Authority,* 718 F.2d 490, 493 (1st Cir.1983) (viability of private right of action not contested by the parties).

A direct right of action has generally been recognized in other circuits. *See, e.g., Miener v. Missouri,* 673 F.2d 969, 973 (8th Cir.1982), *cert. denied,* 459 U.S. 909, 916, 103 S.Ct. 215, 230, 74 L.Ed.2d 171, 182 (1983); *Doe v. New York University,* 666 F.2d 761, 775 (2d Cir.1981); *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1378 (10th Cir.1981); *Helms v. McDaniel,* 657 F.2d 800, 806 n. 10 (5th Cir.1981), *reh. denied,* 664 F.2d 291 (11th Cir.1981), *cert. denied,* 455 U.S. 946, 102

S.Ct. 1443, 71 L.Ed.2d 658 (1982); *Kling v. County of Los Angeles,* 633 F.2d 876, 878 (9th Cir.1980); *NAACP v. Medical Center, Inc.,* 599 F.2d 1247, 1258–59 (3rd Cir.1979); *Lloyd v. Regional Transportation Authority,* 548 F.2d 1277, 1284–85 (7th Cir. 1977). In this district, it has likewise been unequivocally held that the Rehabilitation Act does authorize a private cause of action in the enforcement of § 504.[9] *Hurry v. Jones,* 560 F.Supp. 500, 510 (D.R.I.1983) (Boyle, Ch. J.), *aff'd in part on other grounds, rev'd in part on other grounds,* 734 F.2d 879 (1st Cir.1984); *Turillo v. Tyson,* 535 F.Supp. 577, 584 (D.R.I.1982) (Pettine, J.).[10]

The chain of precedent is a formidable one. Although an outright holding is not necessary for determination of this case, *see* text *post,* the court will begin with the assumption that a private litigant (such as Bento) can sue out a § 504 claim on his own behalf.

■ The relevant text of § 504 is set out in the margin at note 7, *ante.* At the threshold, the defendant interposes an argument that the suit is barred because Bento has neglected to exhaust administrative remedies. The rationale which underlies that contention is anfractuous at best, and is especially difficult to fathom in the context of this case. Bento appears not to have been shy about approaching administrative agencies. As noted above, he filed complaints of handicapped discrimination with both the Providence Human Relations Commission and the OFCCP. The Commission made a finding of no probable cause;

---

tion as to how, if at all, this administrative record impacts any § 503 claim.

**9.** These decisions, of course, commend themselves to this court as a matter of intra-court comity. *See Fricker v. Foster,* 596 F.Supp. 1353 at 1356 (D.R.I.1984); *Daigneault v. Public Finance Corp.,* 562 F.Supp. 194, 197 n. 3 (D.R.I. 1983); *United States v. Anaya,* 509 F.Supp. 289, 293 (S.D.Fla.1980) (en banc). "While the judges of a unified federal district are not constitutionally or legally bound to march in lockstep, the seeds of chaos are sown if a single court prances off in sharply conflicting directions. Lawyers and litigants in such circumstances have

little hope of achieving the predictability of results toward which simplification of the judicial process is necessarily targeted." *Fricker,* at 1356. There are in this case no exceptional circumstances which would warrant departure from these well-reasoned precedents.

**10.** *Turillo,* while never appealed, is of uncertain precedential value, as it has recently been questioned by the Supreme Court. *Smith,* 104 S.Ct. at 3472. *Smith,* however, while indicating that *Turillo* was wrong-headed on a tangentially related point, *id.,* in no way negated the existence of a private right of action under § 504.

the OFCCP concluded that there had been no § 503 discrimination. Both of these proceedings have reached the end of the administrative road. While Bento admittedly did not appeal the disposition of his § 503 claim within the OFCCP, that is of no consequence inasmuch as the court has declined to recognize any direct right of action under that statute. If the defendant's professed concern is that the § 504 claim was not administratively exhausted, it overlooks the well-reasoned line of cases which bear witness to the absence of any need to suck administrative remedies dry before resorting to the courts under § 504. *See, e.g., Pushkin,* 658 F.2d at 1381–82; *Kling,* 633 F.2d at 879; *Camenisch v. University of Texas,* 616 F.2d 127, 135–36 (5th Cir. 1980), *vacated on other grounds,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). *Cf. Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). ITO's exhaustion cantata is a tired and tuneless refrain. It does not suffice to interdict the action.

■ In order to state a claim for violation of § 504, Bento must prove that (i) he is a "handicapped person" under the Act, (ii) he is "otherwise qualified" for the position, (iii) he is being excluded from the position solely by reason of his handicap, and (iv) the position exists as part of a program or activity receiving federal financial assistance. *Doe v. New York University,* 666 F.2d at 774–75. *See generally,* 29 U.S.C. § 794. The first of these requirements is not really in issue. Not only does the plaintiff appear to slip neatly within the integument of the Act,[11] but the caselaw indicates that a coronary condition such as has afflicted Bento should indeed be regarded as a documented physical impairment which substantially limits some of his

major life activities. *Cf. Bey v. Bolger,* 540 F.Supp. 910, 927 (E.D.Pa.1982) (cardiovascular disease). Even the defendant, unsympathetic as it is to Bento's cause, has not argued in a contrary vein. Thus, it can be taken as a given that § 504 is available to the plaintiff if he has proven the other elements of the cause of action.

■ Bento's case is frail as to each of the three remaining sides of the § 504 quadrilateral. But, the weakness is nowhere more apparent than in respect to the question of whether or not the position exists as part of a program or activity receiving federal financial assistance. *See* 29 U.S.C. § 794. In his pleadings, Bento alleged that ITO is and has been involved in interstate shipping and has received federal financial assistance and federal contracts in excess of $2500. ITO admitted those allegations. It is well established under federal law that admissions in the pleadings are, as a general rule, binding upon the parties. *See, e.g., Brown v. Tennessee Gas Pipeline Co.,* 623 F.2d 450, 454 (6th Cir.1980); *Romero Reyes v. Marine Enterprises, Inc.,* 494 F.2d 866, 868 (1st Cir.1974). And, for purposes of this case, ITO is hoist upon the petard of its judicial admissions.[12]

Yet, while the defendant is so bound, the plaintiff's complaint did not allege, nor did the defendant's answer address, the subject of whether the position to which Bento aspired was part of the program receiving federal financial assistance. *See Brown v. Sibley,* 650 F.2d 760, 769 (5th Cir.1981). The Supreme Court has very recently spoken to the question of the scope of § 504 in *Consolidated Rail Corp., supra.* While the Court rejected the argument that the reach of § 504 was dependent upon the granting of federal funds for the primary

---

**11.** 29 U.S.C. § 706(7)(B) proclaims in material part that a "handicapped" person is any individual who:

> (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities;
> (ii) has a record of such an impairment; or
> (iii) is regarded as having such an impairment.

**12.** On the eve of trial, the defendant moved for leave of court to amend its answer so as to delete these admissions. The acknowledgements had been filed early in the case, and the plaintiff's discovery initiatives had, according to his counsel, been crafted with the admissions in mind. Noting the palpable prejudice to the plaintiff which this eleventh hour maneuver seemed to entail, the court denied ITO's motion.

purpose of promoting employment, the court did note that the language of the statute "limits the ban on discrimination to the specific program that receives federal funds." *Id.* 104 S.Ct. at 1255. And, the case was remanded for further fact-finding precisely because the question "whether respondent's decedent had sought and been denied employment in a 'program ... receiving federal financial assistance'" had neither been raised nor answered. *Id.* 104 S.Ct. at 1256.

In the case at bar, the plaintiff presented no evidence whatever that Bento sought to be employed in a program or activity of the defendant which had received federal funds. The defendant's admissions do not extend to this point, and Bento, who had the devoir of persuasion on each essential element of the cause of action, *see, e.g., Doe,* 666 F.2d at 774; *Mantolete v. Bolger,* 96 F.R.D. 179, 182 (D.Ariz.1982); *cf., McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801–02, 93 S.Ct. 1817, 1823–24, 36 L.Ed.2d 668 (1973), failed entirely to close the gap. In the absence of proof that the longshoring work to which the plaintiff aspired was part and parcel of such a federally-assisted activity, Bento cannot recover against the defendant under § 504. *Brown v. Sibley,* 650 F.2d at 769–70; *Simpson v. Reynolds Metals Co.,* 629 F.2d 1226, 1231–32 (7th Cir.1980); *Myers v. New England Tel. and Tel. Co.,* 35 F.E.P. Cases 767, 768 (D.Mass.1983).

While this hole in the proof is dispositive of the plaintiff's § 504 claim, the court will briefly review the juxtaposition of the law and the evidence on the two remaining prongs of Bento's § 504 thrust. For purposes of this case, these points can be considered as a unit.

■ There is no question but that the plaintiff, who first worked as a longshoreman in 1936, is qualified to do the job, at least in the sense of knowing how to perform it. He has more than thirty years of actual experience and carries an "A" seniority card (tantamount to the Union's seal of approval). He labored as a longshoreman for the defendant, among others, for

many years; and, since early 1982, he has performed some such work. Yet, while Bento certainly possesses the knowledge, skills, and experience to be a longshoreman, the Act speaks in terms of "otherwise qualified handicapped" individuals. 29 U.S.C. § 794. It is now clear beyond peradventure that this language refers to those who are qualified in spite of their handicaps. Thus, there is no requirement that an employer disregard a disability which afflicts a potential employee if the handicap is relevant to reasonable acceptance qualifications. *Southeastern Community College v. Davis,* 442 U.S. at 406, 99 S.Ct. at 2367. And, Bento must also prove that the defendant eschewed his services solely by reason of his handicap.

Several of the witnesses indicated that ITO, knowing Bento's history of heart disease, was genuinely concerned as to whether he could do the job without serious risk to his own safety and that of his fellow workers. Groom's testimony on this aspect of the case was particularly impressive. It is plain that Stanton served primarily as an internuncio; Groom, his superior, was the decision-maker for ITO vis-a-vis Bento's effort to return to the gang. Groom testified convincingly that he instructed his Providence manager not to permit the plaintiff to come aboard unless and until he produced some medical evidence certifying that he was physically capable of doing the usual and customary work of a longshoreman. Groom maintained that his position had been static since day one: ITO would immediately reemploy the plaintiff if Bento received medical clearance. And Stanton, whose own initial reaction had been along the same lines, followed these instructions to the letter. The court is persuaded that Groom and Stanton were credible witnesses and that ITO based its exclusion of Bento on this ground in good faith.

Nor were the defendant's actions unreasonable. ITO knew that, not long before these events unfolded, Bento had been adjudged totally and permanently incapacitated, and placed on a disability retirement pension. He had remained in that status

for a considerable period of time. On October 5, 1981, when Bento first surfaced at the shape-up, he was not even eligible to work due to his continued receipt of disability pension benefits. Despite the correspondence detailing his intention to return to the docks, he never specified the exact day when he proposed to start. And, while neither the Association nor the Union responded directly to his queries about his status, the burden of clearing this obstacle from the path was surely his—not theirs. Any reasonable person scanning Bento's letters could assume no more than that he planned to come back; nothing in the correspondence or in the circumstances required the Association or the Union (much less ITO) to treat him as part of the regular workforce on October 5. And, he appeared without having surrendered his disability pension and without any meaningful medical testimonial as to his recuperation. Thus, ITO's initial rejection was wholly appropriate.

From that time forward, the defendant's conduct was likewise within the bounds of reasonableness. The everyday tasks of a dock-walloper are rigorous. The condition from which the plaintiff had suffered was a grave one. The allopathic evidence which Bento presented to ITO was flimsy at best. Dr. Saltzman's note cautioned against excessive climbing, yet such climbing was a routine part of a longshoreman's regular duties.[13] Similarly, Dr. Brannon's report was not unqualified. While Bento had made a satisfactory recovery, he required various theraputants to stabilize and control his condition. And, the record is clear that the plaintiff never took this medication. Nor did Dr. Brannon opine as to Bento's ability to do the heavy work of a longshoreman. Under the circumstances, the ambiguities in the report raised sufficient doubts about Bento's overall fitness that the defendant's refusal to accept it as a complete medical work clearance cannot be faulted.

Dr. Nanian's report, issued January 17, 1983, also contained reservations. This physician noted that Bento suffered complications at a fairly high level of effort, and recommended that Bento be employed in a job which would not require exertion that would raise his pulse level above 120 beats per minute. No evidence was offered to show that stevedoring work was within the medically permissible range. The commonsense inference from the evidence, given the nature of longshoring work, is that some of the tasks routinely incident to that occupation would breach the penumbras of Dr. Nanian's warning.

It is true that, at the trial, Dr. Kitzes offered positive evidence that Bento was fit to return to duty as a wharf hand.[14] But, there is nothing to show that the defendant was aware of these opinions prior to the trial. In response to a specific inquiry on cross-examination, the doctor stated that Bento had never approached him for a medical clearance ancillary to the plaintiff's anticipated return to work. And, Dr. Kitzes' testimony is shadowed somewhat by the testimony of Dr. Sagall, who was equally certain that Bento's return to longshoring work would put the plaintiff and his coworkers at substantial risk. Sagall, noting the nature of Bento's documented heart disease, firmly opined that his return to strenuous work would be "playing with fire" and "playing a dangerous game." Though the force of Sagall's conclusions was blunted by his limited knowledge of Bento's case, his insights were of some value.

---

**13.** Groom testified, for example, that car ships were frequently unloaded at the port; that these vessels typically were built with 13 deck levels; and that dock hands discharging the cargo would have to ascend a 100 foot ramp, inclined at an angle of 30 to 40 degrees, and then ascend an additional 5 decks to reach the topmost vehicles. He similarly detailed ascensive activities required in the loading and unloading of container ships, lumber ships, and other vessels which commonly called at the port of Providence. The court credits this testimony.

**14.** Dr. Kitzes had been involved in the plaintiff's care and treatment in 1979; he had no occasion to see Bento again until late January of 1983. His opinions as to Bento's condition in 1981–82 were largely hypothetical in nature.

■ The Rehabilitation Act protects only workers who remain qualified for their jobs in spite of their handicaps. *Southeastern Community College v. Davis*, 442 U.S. at 406, 99 S.Ct. at 2367. Employers are not required to overlook the disabilities of a handicapped employee when the affliction relates to the reasonable criteria for employability in a particular post. *Doe*, 666 F.2d at 775. And, an employer may consider his employee's disability as it may affect the safety and welfare of other employees. *Prewitt v. U.S. Postal Service*, 662 F.2d 292, 310 (5th Cir.1981).

■ This leeway, which is given to the employer by the statute and confirmed by the caselaw, allows the company to make a rational business decision, fairly and objectively, about a specific employee's ability to perform a job. If the employer reasonably believes that the employee is unable adequately to perform the work and refuses to hire him on that basis, the federal law will not have been transgressed. *See Cook v. U.S. Dept. of Labor*, 688 F.2d 669, 670 (9th Cir.1982), *cert. denied*, — U.S. —, 104 S.Ct. 112, 78 L.Ed.2d 113 (1983). In this instance, ITO possessed only tentative or significantly qualified medical endorsements of Bento's fitness to perform longshoreman's work. On October 5, 1981 (and even up to and after receipt of Dr. Nanian's report in January, 1983), there was persuasive evidence that Bento was not completely recovered and/or physically qualified to toil on the docks. Thus, to the extent that Bento was not hired because of his disability, ITO was entitled to take that disability into account.

An interesting parallel to this situation exists in *Walker v. Attorney General*, 572 F.Supp. 100 (D.D.C.1983). There, the FBI discharged an employee suffering from a cardiac condition with moderately severe angina attacks when his apparent condition prevented him from performing heavy labor. *Id.* at 101. Unknown to the FBI, however, the plaintiff's condition was not as severe as the doctor had represented. The court ruled that the employer's duty (if any) to inquire into the accuracy of the doctor's diagnosis was more than met by referring Walker to the national naval medical center for an evaluation which had confirmed the original incorrect diagnosis. *Id.* at 102. Thus, although the FBI's decision may have been wrong in fact, it was justified on the evidence and therefore not violative of the Rehabilitation Act. *Walker* argues persuasively for the defendant's position on this issue. In the case at bar, ITO had participated in the plaintiff's referral to two different doctors at two different times and neither had provided an unqualified endorsement of Bento's physical ability to do the work. Whether or not wrong as a matter of medical fact, the defendant's decision was a reasonable one, based on what, in the exercise of due diligence, it had learned.

Since ITO has always been willing to hire Bento with appropriate medical support, its repeated refusal to do so without that comfort—behavior which the court finds to have been rooted in genuine concerns anent the state of his health—cannot be labelled as a cover-up for handicap discrimination.[15] The plaintiff has not proffered any evidence which impugns the defendant's bona fides or discredits the ground offered by ITO as a justification for its exclusionary conduct, nor does the record furnish any sufficient basis for a finding that the asserted reason was pretextual. An employer in such circumstances may surely be required to assess the nature and extent of an employee's disability in reasonable and realistic terms. Once this is done, however, the assessment itself need not reach a medically unassailable conclusion; the law

---

15. Of course, Dr. Kitzes, in his testimony, gave Bento a generally clean bill of health. While ITO was not chargable with knowledge of this physician's views up to the time of trial, it is now squarely on notice. Should the plaintiff hereafter apply for longshoring work in a federally-assisted activity operated by the defendant, a future rejection might well be actionable. But, that set of circumstances is not presently before this court, and must be left for another day.

does not demand either omniscience or deuteroscopy.

 Plaintiff has also argued that ITO could have employed Bento, availing itself of his job skills and accomodating his disability, by hiring him in a light duty position. While the imperatives of the Rehabilitation Act require employers to make reasonable accommodations for an employee's disability, *see e.g., Stutts v. Freeman,* 694 F.2d 666, 669 (11th Cir.1983); *Prewitt,* 662 F.2d at 310, they do not obligate companies materially to rewrite job descriptions. In *Stutts,* the Eleventh Circuit expressly declined to direct that the plaintiff be hired as a heavy equipment operator, but required the TVA to use tests which would both accommodate his dyslexic condition and fairly test his ability to do the job. 694 F.2d at 669.

 The nub of the Rehabilitation Act in this wise is that the employer must make a reasonable good-faith effort to adjust its legitimate needs to a handicapping condition which does not, fairly viewed, debar the putative employee from doing the job. It does not demand that an employer settle for a worker who cannot effectively perform essential functions of the position. *Cf. Mahoney v. Trabucco,* 738 F.2d 35, 39 (1st Cir.1984) (ADEA requires that bona fide occupational qualification be resolved not in terms of a particularistic analysis of the actual duties performed by a worker at a precise moment but in terms of the realistic requirements of the job classification itself). It is not for this court to decide that ITO should have hired a handicapped longshoreman to do limited work in preference to a longshoreman who could carry out all of the necessary tasks inherent in longshoring work.

Furthermore, in Bento's case, this argument is twice flawed. First, the evidence reflects that ITO, as a general rule, hires only longshoremen who are fully qualified to perform the entire panoply of tasks associated with the position. There is no proof that any stevedores were ever singled out by ITO for light duty sinecures (although the defendant, and every other cargo-handler, did nominate walking foremen, *see* note 2 *ante* ).[16] Second, the variations in the type of work performed by the longshoremen, the gang assignments, and the job assignments within each gang, are determined by the Union. While ITO has the power to exclude or not to exclude a given laborer from its vessels, the defendant is subject to the dictates of the collective bargaining agreement and is not in a position unilaterally to provide him with a particular kind of work. If any light duty accommodation is to be made for Bento's condition, it must be done by the Union; ITO has insufficient say as to individual job assignments.

## IV. Conclusion.

While ITO clearly turned an unsympathetic ear to Bento's efforts to return to his former work, it was not an unlawful one. The plaintiff has not proven (i) that the program or activity in which he sought employment was a recipient of federal funding, or (ii) that he was, at the relevant time, qualified to do the operose tasks required of a longshoreman in spite of his disability or (iii) that ITO unreasonably excluded him from its vessels. Based upon the findings of fact and conclusions of law set forth above, the second count of the further amended complaint must be, and hereby is, denied and dismissed. Since a verdict has previously been directed in ITO's favor on the ADEA claim, *see* text *ante* at Part II, the clerk is directed to enter judgment for the defendant for costs on both counts.

*It is so ordered.*

16. There is no credible evidence that the plaintiff applied to work for the defendant as a walking foreman, or that ITO, during the period in question, had any such vacancy. Most (if not all) of the firms on the waterfront tend to be loyal to their regular walking foremen.