**Michael SALMON PIÑEIRO, Plaintiff,**

v.

**John F. LEHMAN, Jr., in his capacity as Secretary of the Navy, Defendant.**

**Civ. No. 85–1810(JP).**

United States District Court,
D. Puerto Rico.

Jan. 8, 1987.

Peter Berkowitz, Hato Rey, P.R., for plaintiff.

Asst. U.S. Atty., Fidel Sevillano, U.S. Atty.'s Office, Hato Rey, P.R., for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

This is an action for reinstatement and back pay, where plaintiff alleges the Navy terminated his employment as a Criminal Investigator, Naval Investigative Service, on the basis of a handicap in violation of Section 501 and 504 of the Rehabilitation Act of 1973 (Act), 29 U.S.C. §§ 791, 794, as amended by the Comprehensive Rehabilitation Service Amendments of 1978, 29 U.S.C. § 794a and in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Jurisdiction is alleged under 28 U.S.C. §§ 1331(a) and 1343(3).

A non-jury trial was held on September 8–10, 1986, where both parties presented their witnesses and submitted documentary evidence. Upon conclusion of the trial, the parties submitted the case to this Court for

adjudication. The Court requested post-trial briefs from the parties. Based upon the evidence submitted by the parties, and after due deliberation, this Court now makes the following Findings of Fact and Conclusions of Law.

## A. FINDINGS OF FACT.

1. Plaintiff, Michael Salmon Piñeiro, presently 28 years of age and a resident of Puerto Rico, was employed by the Naval Investigative Services, Department of the Navy, as a Criminal Investigator, GS-1811-7 on January 12, 1981. Plaintiff was appointed to an exempted service position and was required to complete successfully a one year probationary period. Mr. Salmon was recruited at a Job Fair for the position because he is bilingual in English and Spanish. Plaintiff's application then proceeded to a Screening Board, who interviewed him to get an impression of his qualifications. The Board then conducted a background investigation into possible arrests, adversity in his background, and his state of health.

2. The Naval Investigative Service (NIS), under the Naval Intelligence Command, operates a worldwide organization to fulfill the investigative and counterintelligence responsibilities of the Department of the Navy. Position Job Description, No. NIS-SP-13-72 Criminal Investigator. The duties of a Criminal Investigator include, but is not limited to, the following: the use of firearms, participation in night and day surveillance operations, criminal investigations involving sabotage and subversive activities, interrogations, apprehension of naval, civilian and military criminal suspects, and the operation of motor vehicles. All applicants must possess a valid automobile license at the time of appointment. After the appointment, the Criminal Investigator must qualify for authorization to operate motor vehicles in accordance with Civil Service Regulations and Department of Navy regulations. Mr. Salmon was aware of these duties, and was further aware that a Criminal Investigator may have to render his services in an area where no medical services are available. The position of Criminal Investigator is classified as a hazardous position under Office of Personnel Management (OPM) Medical Requirements. The requirements further state that a person who is employed in a hazardous position, and who suffers from epilepsy, blackouts, fainting spells, seizures, or convulsions, must be seizure free for two years without taking medication. FPM, Supplement 339-31, subchapters S1-3.

3. The qualifications for the job of Criminal Investigator include, but is not limited to, the following: a baccalaureate degree from an accredited United States college or university; a minimum age of 21 years; United States citizenship for at least 5 or 10 years [1]; successful completion of a five-week basic training course at the Naval Investigative Service Headquarters during the first 12 months of employment; a security clearance; a valid driver's license, as outlined above; and a pre-employment physical performed by a Federal Medical Officer.

4. Plaintiff was graduated from the Georgia Military College in 1977 with a baccalaureate degree in general studies and a concentration in law enforcement science. In 1979 he obtained a Master's Degree from the George Washington University. On April 17, 1981 he was graduated from the Navy's Criminal Investigator Basic Training Course and received a certificate of completion.

5. On January 21, 1981, Dr. Bernabe Lima, a Federal Medical Officer, conducted a pre-employment physical on Salmon at the U.S. Naval Hospital in Miami, and issued a Certificate of Medical Examination, recommending the Navy hire plaintiff. Defendant's Exhibit ID-A. Plaintiff certified in Part A of the Certificate that all the

---

1. The Position Job Description, Number NIS-SP-1372, Criminal Investigator, promulgated by the Department of the U.S. Navy, lists that a trainee must possess a minimum of 10 years citizenship. Chapter 13 of the NIS manual, titled Special Agents Manual, states that an applicant must have a minimum of five years U.S. citizenship. Because plaintiff meets both requirements, the conflict is here immaterial.

information he gave Dr. Lima in connection with the physical was correct to the best of his knowledge. The plaintiff stated during the pre-employment physical that he had never suffered seizures or convulsions in the past. Consequently, Dr. Lima did not circle the handicap "epilepsy" under the "handicap code" in the Certificate of Medical Examination. Plaintiff admitted during direct testimony that he told the doctor that he never suffered from epilepsy. At the time of this physical examination, plaintiff had suffered at least three convulsions or seizures: he suffered a seizure in April, 1976, while attending the Georgia Military Academy. He suffered a second seizure approximately 90 days later, and a third seizure in December, 1977, while at his mother's home in Puerto Rico. He suffered a fourth seizure on April 1, 1981, during a training exercise with the NIS, which is the incident that gave rise to this litigation. These seizures are more fully described below.

6. Mr. Salmon suffered his first seizure in April of 1976, while he was attending the Georgia Military Academy. Plaintiff was prescribed 300 mg. of dilantin a day, an anti-convulsant medication used to control epileptic seizures, which he took for a period of 90 days. When he resumed studies in August, and after he stopped taking the medication, he suffered a second seizure. Upon a medical evaluation by Dr. Sibley at the Academy, Mr. Salmon was restricted from certain physical activities, including the handling of weapons and heavy machinery, and was released from an ROTC training program. He resumed daily medication of dilantin until he graduated from the Academy in 1977.

Plaintiff then entered the George Washington University in late 1977 and continued to take the medication, but not on a daily basis. He suffered his third seizure during the 1977 Christmas break, while at home with his mother in Puerto Rico, when he was not taking the medication. He resumed taking his medication irregularly until February of 1980. He skipped some days in the summer of 1980, but resumed taking it regularly in December of 1980, until January of 1981.

7. Until January of 1981 and after plaintiff was hired, the defendant had been previously unaware of any of the seizures Mr. Salmon had suffered. During the course of its background investigation of plaintiff, defendant became aware that plaintiff suffered a seizure at the Georgia Military Academy in 1976 and that plaintiff was prescribed Dilantin. Plaintiff's Supervisor, Special Agent James Creaturo, interviewed plaintiff in late January 1981, and plaintiff admitted having the seizure in 1976. At Mr. Creaturo's request, plaintiff obtained a letter from his family physician, Dr. Ramón Suárez Benítez regarding his history with the medication and the 1976 seizure. Dr. Suárez Benítez responded with a January 20, 1981 letter stating in toto the following:

> History of dizzy spells since 1971, and first examined by me on December 22, 1972. There is no epilepsy in the family. In May 1976 an electroencephalogram and brain scan were reported negative. In spite of this he was started on Dilantin 100 mg. three times daily. The patient informs me he stopped Dilantin in 1979 and since then he had had no dizzy spells nor seizures. Physical examination today was completely negative. It is my impression that this patient is not suffering from any disease at the present time.

Plaintiff did not tell Dr. R. Suárez in January 20, 1981 that he had been taking Dilantin up to January 1981. Although plaintiff had not previously disclosed the three seizures to Navy personnel, after this further investigation he disclosed them to the Navy and admitted them on the witness stand. Dr. Suárez' opinion is not valid as it is based on an untrue statement as to the use of dilantin, which was material for the diagnosis of epilepsy. Plaintiff discontinued his medication after his discussion with Mr. Creaturo, believing continued use might adversely affect his employment as a Criminal Investigator.

On March 1, 1981, Mr. Salmon was sent to Suitland, Maryland, to attend the NIS Basic Special Agent School. He suffered a fourth seizure on April 1, 1981, while participating in a surveillance exercise during the agent's basic training course in Arlington, Virginia. In this eight-hour stressful exercise, Mr. Salmon participated in a seven member team pursuing a makebelieve felon across state lines. With two other team members in a vehicle during pursuit, Mr. Salmon suffered the seizure which left him incapacitated. The exercise was interrupted and an ambulance took Mr. Salmon to a local hospital, where he was diagnosed as having suffered a grand mal seizure; dilantin was administered. On that same date, Mr. Salmon was released from the hospital and returned to training the next day.

8. On or about April 3, 1981, Dr. Eric G. Six, a Federal Medical Officer, examined plaintiff at the National Naval Medical Center in Bethesda, Maryland. On April 15, 1981, Dr. Six issued a report recommending that plaintiff "plan on taking his Dilantin at the doseage of 300 mg. a day from now on." He was also of the opinion that plaintiff should "be placed on a limited duty status which would include being unable to handle firearms or drive a government vehicle ..." Letter Report of Dr. Eric G. Six, dated April 15, 1981. He further said that Salmon's job should not be in jeopardy simply for being on dilantin. These statements, which were not binding on the government, were also not conclusive as to any future conduct by the goverment in this case.

9. Mr. Dennis E. Usrey, Assistant Director for Career Services at NIS, after consultation with the Servicing Personnel Office, determined that plaintiff, because he was not seizure free without medication for two years, was not medically qualified for the position of Criminal Investigator. On April 17, 1981, the date plaintiff graduated from the agent's basic training course, Usrey met with plaintiff at NIS Headquarters in Maryland. He informed plaintiff that he was not medically qualified under the OPM regulations for the position

of Criminal Investigator, showing plaintiff the OPM regulations and the letter from Dr. Six. He gave Mr. Salmon the option of extending his temporary duty assignment in Washington, D.C., for two weeks so that he could seek alternative employment, or of resigning immediately. Salmon, upset and uncommunicative, indicated he wanted to sleep on it. He never gave Usrey an answer, and instead, returned to Puerto Rico the following day and reported to his duty assignment at Roosevelt Roads on Monday, April 20, 1981, the next working day.

10. In the April 17, 1981 discussion, Usrey inquired as to other areas of nonhazardous work that plaintiff might be interested in pursuing, in order to place him in a position for which he would be qualified. Mr. Salmon responded that he was interested only in the position of Criminal Investigator. Because Salmon showed no interest but in the position of criminal investigator and he left the next day without any communication, Mr. Usrey was not placed in a position to offer another alternate job. J.R. Soriano, Director of the NIS, by letter of April 29, 1981, terminated plaintiff's position with the NIS effective May 1, 1981, stating that upon review of Dr. Six's report, plaintiff did not meet the medical requirements for a hazardous position defined in the OPM regulations.

11. When Salmon returned to Puerto Rico, Special Agent James Creaturo interviewed plaintiff to discuss alternative government employment. Creaturo knew the special agent in charge of the Defense Investigative Service (D.I.S), and inquired into Salmon's interest in a position there. Salmon's response was that he wanted to remain employed as a criminal investigator with the NIS. Based on this response, Creaturo did not refer plaintiff to the D.I.S. Creaturo was also aware of a vacancy in the position of Intelligence Research Specialist with the NIS. Because the position required experience in counter intelligence, which Salmon lacked, Creaturo was unable to recommend plaintiff for the job. Creaturo later recommended plaintiff to seek advise with the Equal Employment Oppor-

tunity Office of the Naval Station in Roosevelt Roads.

12. Plaintiff appealed his termination by letter to the Merit System Protection Board (MSPB), which was referred to Francis L. Antoine. Antoine, a Deputy Equal Employment Officer with the Naval Intelligence Command, assists and advises Naval employees on their rights and responsibilities regarding Naval regulations and employment discrimination. Antoine informed plaintiff that the MSPB rejected plaintiff's claim, and upon Salmon's request, assigned an Equal Employment Officer for a report of his case. Antoine determined the officer's report lacked information, and took further action.

Antoine discussed with the possibility of a reasonable accommodation for plaintiff with Mr. John D'Avanzo, the Assistant Director for Career Services, responsible for recruitment and placement of NIS personnel, and Captain Soriano, Director of the NIS. Antoine located two positions, (1) Evidence Technician in Norfolk, Virginia, and (2) Accounting Technician at NIS Headquarters. He informed Salmon that he was looking into these positions for him. However, after more research, he found that the evidence job required that use of firearms and an automobile driver's license, which disqualified Salmon. Captain Soriano directed Antoine to determine whether plaintiff would be interested in the accounting job, and if so, to offer the position. Antoine then discussed this position with Salmon, who manifested his disinterest, and therefore Antoine did not offer the job. Plaintiff's case was assigned to another officer, and Antoine's involvement then ended.

13. We conclude and adopt as our finding Dr. Charles A. Payne's testimony to the effect that there is no medical certainty that even a person whose seizures are controlled by medication will not suffer seizures in the future, particularly when the individual is subject to a hazardous stressful job; also that the plaintiff is not medically qualified for the job of criminal investigator because a) the plaintiff is an anti-

convulsant dependent as he has seizures whenever he stops taking medication, b) the NIS could not rely on plaintiff to take the medication regularly, as demonstrated by the times he has discontinued taking the medication, c) and the job is hazardous and may endanger his life and that of others if he suffers a seizure while on duty, as this job itself may precipitate a seizure, even while on medication.

## B. CONCLUSIONS OF LAW

### 1. *The § 501 Claim:*

§ 501(b) of the Act, 29 U.S.C. § 791(b), defines the obligations of the Federal government regarding employment of handicapped individuals:

> Each department, agency, and instrumentality (including United States Postal Service and the Postal Rate Commission) in the executive branch shall ... submit to the Office of Personnel Management and to the (interagency committee on handicapped employees) an affirmative action program plan for the hiring, placement, and advancement of handicapped individuals in such department, agency, or instrumentality. Such plans shall ... provide sufficient assurances, procedures and commitments to provide adequate hiring, placement and advancement opportunities for handicapped individuals.

29 U.S.C. § 791(b). It proscribes discrimination by the Federal government in the hiring, promotion, and other employment of handicapped individuals.

Section 501 requires affirmative conduct on the part of federal agencies. It imposes "a duty upon federal agencies to structure their procedures and programs so as to ensure that handicapped individuals are afforded equal opportunity in both job assignment and promotion." *Prewitt v. United States Postal Service*, 662 F.2d 292, 306 (5th Cir.1981), *quoting Ryan v. Federal Deposit Insurance Corporation*, 565 F.2d 762, 763 (D.C.Cir.1977).

Before filing a § 501 action, plaintiff must exhaust administrative remedies. *See Gardner v. Morris*, 752 F.2d 1271,

1278–79 (8th Cir.1985). See also 29 U.S.C. § 794a(a)(1) (1982). There is no dispute here that Salmon exhausted all administrative remedies. He first took his case to the Merit System Protection Board, which denied his claim. He also sought redress from the Equal Employment Opportunity Commission, and from there, he seeks vindication in district court.

■ To establish a prima facie case of unlawful employment discrimination under section 501, the plaintiff must prove that "(1) except for a physical handicap, the plaintiff is qualified to fill the position, (2) he has a handicap that prevents him from meeting the physical criteria for employment, (3) the challenged physical standards have a disproportionate impact on persons having the same handicap from which he suffers. To sustain this prima facie case, there should also be a factual showing or at least plausible reasons to believe that the handicap can be accommodated or that the physical criteria can be job related." *Prewitt, supra,* 662 F.2d at 309–10. Once and if the plaintiff establishes his prima facie case, the government has the burden of persuasion to show that a reasonable accommodation cannot be made. *Id.* at 10. See also, 29 C.F.R. § 1613.704.

■ Applying these principals to the facts, the Court concludes that Salmon has established a prima facie case, and the government concedes this in its post-trial brief. Salmon met all the job qualifications for a Criminal Investigator as outlined in Findings of Fact Number 3, and he received a certificate of completion for the basic training course. Except for his suffering from epilepsy, plaintiff would be fully able and qualified to perform this position.

■ Second, Salmon suffers a handicap within the meaning of 29 U.S.C. § 706(7)(B). *See also Drennon v. Philadelphia General Hospital,* 428 F.Supp. 809, 815 (E.D.Pa.1977). His family physician, Dr. Ramón M. Suárez Benítez, in 1981 diagnosed Mr. Salmon's ailment as a history of "convulsive episodes." Under the OPM medical requirements, FPM Supplement 339–31, Subchapter S1–3, the job-seeker must be seizure free, which includes epilepsy, blackouts, fainting spells, for a period of two years without medication before he begins working. Mr. Salmon was unable to meet this physical requirement because he suffered a fourth seizure during a night surveillance operation while in basic training and while taking medication (Dilantin) intermittently for the previous two years.

As to the third element of the prima facie case, "disproportionate impact" means that the OPM regulations have an adverse impact on a group of handicapped individuals as opposed to the general populace. Here, the OPM medical requirements have a disproportionate impact on individuals who suffer from repeated seizures or epilepsy because a job applicant who is epileptic may be unable to obtain the position of criminal investigator.

The burden now shifts to the government to prove that a reasonable accommodation cannot be made that would enable the handicapped applicant to perform the essentials of that job. In other words, NIS must show that the physical standards are job related, make a reasonable accommodation for the handicap or "demonstrate that the accommodation would impose an undue hardship on the operation of the program," 29 C.F.R. 1613.704(a), while considering the factors listed in § 1613.704(c).

In analyzing these factors, the Court considers plaintiff's suggested accommodations. Plaintiff proposes three: (1) allow Mr. Salmon to control his epilepsy through medication; (2) restructure the position by eliminating the tasks he cannot perform, and (3) place Mr. Salmon in a non-hazardous position.

In considering his first proposal, the Court turns to the expert medical testimony. Plaintiff's expert testified that, among epileptic patients, no generalization may be made regarding future seizures, but predictions may be made on an individual, case by case basis upon examination of that patient's medical history. He further testi-

fied that regarding the plaintiff, if he takes dilantin regularly and as prescribed, the chances of another seizure are "extremely remote." However, he also testified that side effects produced by regular ingestion of dilantin include drowsiness, slurred speech, and an appearance of drunkenness. The defendant's expert testified that, even if Mr. Salmon, who he described as anti-convulsant dependant, took dilantin regularly and as prescribed, he could still suffer future seizures.

■ This Court cannot base its judgment on predictions, but must base it on the facts and the evidence. A criminal investigator for the NIS may be sent without notice to remote locations around the world where medical facilities are unavailable to dispense dilantin. Without the anti-convulsant, Mr. Salmon's seizures cannot be controlled. Moreover, even if Mr. Salmon were taking a regular dosage, there is no guarantee he would be seizure free. Furthermore, as testified by plaintiff's expert, the side effects of dilantin impairs the Salmon's alertness and reaction. Assuming the Court did recognize this to be a reasonable accommodation, which the Court does not, plaintiff has demonstrated an unreliability in maintaining his prescription. Patently, to allow this proposal would result in undue hardship on the operation of the NIS. The Court will not speculate as to the created dangers to plaintiff and his fellow agents under this accommodation.

■ Plaintiff's second proposal, to restructure his specific job, is also unavailing. The hazards of the job, carrying and using firearms, operating of motor vehicles, apprehending civilian and military criminals, conducting day and night surveillance operations, and world wide pursuit of criminal suspects, cannot be eliminated without obliterating the essence of the job. Furthermore, a job restructuring that would, for instance, eliminate the use of firearms or the operation of motor vehicles, severely limits his utility to the NIS, and if allowed to work with other agents in a limited capacity could place them in a position of

danger. Under this proposal, Salmon cannot safely and efficiently perform the essentials of the position without endangering himself or others. *See Simon v. St. Louis County*, 735 F.2d 1082 (8th Cir. 1984); *Treadwell v. Alexander*, 707 F.2d 473 (11th Cir.1983).

■ The plaintiff's final proposal, to place him in a nonhazardous position, contradicts his actions at the time of his job termination. Dennis E. Usrey, Assistant Director for Career Services at NIS, gave Salmon the option of extending his temporary duty for two weeks so that he could seek advice from the personnel office. This option he rejected. Usrey also inquired into other areas of interest in non-hazardous positions, and plaintiff expressed none, stating he was interested only in the position of criminal investigator. Under these circumstances, the NIS was not in a position to offer alternate employment, and had no obligation to offer him alternate positions which he rejected.

■ The government makes an interesting argument regarding reasonable accommodation and the veracity of Salmon's employment application. The government argues that, because Salmon intentionally misrepresented his employment application by failing to disclose the three seizures he suffered prior to his pre-employment physical, his employment with the NIS was void. Pursuant to 5 U.S.C. § 3301 and its implementing regulations, 5 C.F.R. § 731.202, the government may deny and/or disqualify an applicant or an existing employee a federal civil service position who has made an "[i]ntentional false statement or deception or fraud in examination or appointment." 5 C.F.R. 731.202(b)(3). Further, probationary employees who are found to have falsely misrepresented their applications may be removed during their probationary period. In *Gipson v. Veterans Admin.*, 682 F.2d 1004 (D.C.Cir.1982), the appeals court affirmed the removal of a Veterans Administration employee for, inter alia, falsifying medical records. In *Rodríguez v. Seamans*, 463 F.2d 837 (D.C. Cir.1972), *cert. denied*, 409 U.S. 1094, 93

S.Ct. 704, 34 L.Ed.2d 678 (1972), the court affirmed the removal of an Air Force civil service employee who falsely misrepresented his application by failing to disclose his communist party membership.

■ We find this argument to be persuasive. We have previously determined that Salmon falsely misrepresented his employment application by denying in his pre-employment physical that he suffered epilepsy and seizures, when in fact plaintiff suffered at least three seizures prior to the examination. Under these circumstances, plaintiff could have been denied employment as a Criminal Investigator, and also could be removed from employment. See 5 C.F.R. 731.202(b)(3). Under these circumstances, it would be highly inequitable to require reinstatement with an accommodation where the plaintiff could be denied employment based on his falsifications. The Rehabilitation Act seeks to promote and expand employment opportunities, for the handicapped. However, it may not be used as a tool for those who seek employment by subterfuge. Therefore, as an alternate holding, we find the government is not obligated to provide a reasonable accommodation by reason of plaintiff's misrepresentation.

### 2. The § 504 Claim: [2]

Section 504 provides in pertinent part: No otherwise handicapped individual ... shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive Agency or by the United States Postal Service.

29 U.S.C. § 794.

The Supreme Court has not specifically decided that a private cause of action exists under § 504, but it has assumed but has not decided that an action may be brought under it. See Consolidated Rail Corp. v. Darrone, 465 U.S. 624, 104 S.Ct. 1248, 1252 n. 7, 79 L.Ed.2d 568 (1984). The court did decide that a plaintiff who alleges intentional discrimination may recover back pay under § 504, but left unanswered to what extent damages are available. See Id. at 104 S.Ct. 1252–53. The First Circuit, relying on Consolidated Rail, also assumed a private action exists in Hurry v. Jones, 734 F.2d 879, 886 (1st Cir.1984); see also Ciampa v. Massachusetts Rehabilitation Comm'n, 718 F.2d 1, 5 (1st Cir.1983) (assuming both that a private action may be brought and that a private right of action for damages may be implied under § 504). A great majority of the other circuits have concluded a private cause of action exists under § 504. See Bento v. I.T.O. Corp. of Rhode Island, 599 F.Supp. 731, 740 (1984) (reiterating that a private cause of action exists in Rhode Island and collecting cases from other circuits). We assume for purposes of further analysis that a private cause exists. We find, however, that plaintiff has not established employment discrimination under § 504.

■ Unlike a claim under § 501, a plaintiff need not exhaust administrative remedies before filing suit for a § 504 violation. See Pushkin v. Regents of the University of Colorado, 658 F.2d 1372, 1380–82 (10th Cir.1981); Bento, supra, 599 F.Supp. at 741; Sanders v. Marquette Public Schools, 561 F.Supp. 1361, 1369 (W.D.Mich.1983). In order to establish a claim for violation of § 504, the plaintiff must prove (1) he is a "handicapped person" within the meaning of the Act, (2) he is "otherwise qualified" for the position, (3) he is being excluded from the position solely by reason of the handicap, (4) the position exists as part of a program or activity "receiving Federal Financial Assistance or under any program

---

**2.** In Gardner v. Morris, supra, the plaintiff filed a § 501 and § 504 suit against the federal government. The Eighth Circuit analyzed the case only under § 501, saying that § 501 provides relief equal to or greater than § 504. We decline to do so here, but attempt to "give effect to both [acts] if possible." Prewitt, 662 F.2d at 304, citing United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). We also continue our analysis, notwithstanding our finding of plaintiff's falsification, to determine the merit of his claim under the Act.

or activity conducted by any Executive agency ..." *See Doe v. New York University,* 666 F.2d 761, 774–75 (2d Cir.1981); *see also* 29 U.S.C. § 794. We have already decided the first issue under the § 501 claim. Epilepsy is a handicap that falls within the scope of the Act. *See Drennon v. Philadelphia General Hospital,* 428 F.Supp. 809, 815 (E.D.Pa.1977). Neither is there an issue regarding the fourth level of the prima facie test. The NIS is part of the Navy, and as such, the NIS is a program or activity conducted by an Executive agency and receives federal financial assistance. Plaintiff's claim rans into trouble on prongs two and three, considered together below.

The Supreme Court interpreted the statutory language "otherwise qualified" in *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Id.* at 406, 99 S.Ct. at 2367. We must consider "legitimate physical requirements" in determining whether plaintiff is "otherwise qualified". *Id.* The Court also held that § 504, unlike § 501, imposes no "affirmative" obligation to modify a program, and the refusal to modify a program did not there constitute discrimination. Id. at 406–413. See, e.g. *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 721 n. 20, 83 L.Ed.2d 661 (1985).

Turning to Salmon's case, we do not find that he was able to meet all of the position's requirements in spite of his handicap. While there is no doubt that Salmon has met all the academic and educational requirements, there are legitimate physical requirements of the job that Salmon cannot meet. The position requires the use of firearms and the apprehension of civilian and military suspects and day and night surveillance under stressful conditions. Of particular concern to this Court is the potential danger both to plaintiff himself and to co-criminal investigators. To reiterate, Salmon would not be able to safely perform this job. It is clear that the government was not required to make major changes in its NIS program without substantially changing the duties of a criminal investigator. *See Gardner v. Morris, supra,* 752 F.2d at 1280; *Stutts v. Freeman,* 694 F.2d 666, 669 (11th Cir.1983). The Rehabilitation Act does not require the government to employ an individual who is unable to perform the essential functions of the position.

Of similarity to this case is *Simon v. St. Louis County,* 735 F.2d 1082 (8th Cir. 1984). In that case the appeals court affirmed the trial court's finding that plaintiff was not an "otherwise qualified handicapped individual." Plaintiff, a police officer, became a paraplegic as a result of a gunshot wound in the line of duty, and was denied reinstatement as a commissioned officer. The court found that he was unable to meet two department requirements, (1) to effect a forceful arrest, and (2) to be able to transfer among all positions within the department. The Eighth Circuit upheld the District Court's findings that the challenged requirements were in fact necessary and legitimate criteria to an effective police force, and the department's refusal to modify them to accommodate plaintiff was not discrimination. *Simon v. St. Louis County,* 735 F.2d at 1084–85. *See also Treadwell v. Alexander,* 707 F.2d 473 (11th Cir. 1983), (undue burden on Army Corp of Engineers to reassign arduous duties of a park technician, who suffers from a nervous condition and a heart ailment, to other technicians).

Thus, the NIS's refusal to make the major changes plaintiff now requests did not amount to discrimination. *See Southeastern Community College v. Davis,* 442 U.S. at 413, 99 S.Ct. at 2370. The NIS was unable to modify the positions without substantially gutting the position, and made a good faith effort at finding employment for which Salmon was qualified. We do not doubt Salmon's enthusiasm, interest, and ambition for the job, but these traits alone cannot overshadow the realities that confront him. Perhaps it is his overzealousness that clouded the manner of his appli-

cation, and his conduct in shunning the assistance given by NIS and EEOC officials. Nonetheless, the Court cannot grant him the relief he seeks.

### 3. The 14th Amendment Claim.

Salmon contends that the OPM regulations requiring applicants for a hazardous position, including that of Criminal Investigator, be seizure free without medication for two years prior to the date of the employment creates an irrebuttable, or conclusive, presumption that he could not satisfactorily perform the job because of the handicap, which deprived him of due process guaranteed by the 14th Amendment.

The Supreme Court has long held in disfavor irrebutable statutory presumptions. *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973). In *LaFleur*, the Supreme Court held that a school board mandatory maternity leave rule violated due process because it created a conclusive presumption that every teacher who was four or more months pregnant was physically incapable of continuing her duties. In *Vlandis*, the Court invalidated a statute that conclusively presumed for purposes of tuition that non-resident students at the time of application for admission would be non-residents during their entire period of attendance. The primary reason for their disfavor lies in the lack of individualized determination of the facts of each case. *Coleman v. Darden*, 595 F.2d 533, 536 (10th Cir.1979) *cert. denied* 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184.

 In fact, an individualized determination of plaintiff's handicap and capabilities was made here. Salmon was not rejected at the application stage because of his handicap. Upon learning that Salmon suffered a handicap rendering him medically and physically unfit to perform the position, the government did not terminate plaintiff's employment. Rather, the NIS continued Salmon's training and graduated him from its special agent school. It only requested a medical certificate attesting to his use of dilantin. The crucial fact in this instance is Salmon's fourth seizure during the simulated training exercise which required its immediate termination, affecting a seven-member NIS team. The government did determine under a real employment condition that plaintiff's handicap could in fact endanger him and his fellow agents. We cannot say here that Salmon was conclusively presumed to be unfit for the job. Under these circumstances, where an individual determination was made, the conclusive presumption doctrine is inapplicable. *Coleman v. Darden, supra,* 595 F.2d at 537.

Accordingly, the complaint is DISMISSED, and the Clerk is directed to enter Judgment for defendant on all claims. Each party is to bear its own costs and attorney's fees.

The Clerk shall act accordingly.

IT IS SO ORDERED.