**Michael V. DiPOMPO, Plaintiff,**

v.

**WEST POINT MILITARY ACADEMY, et al., Defendants.**

**No. 86 Civ. 4124 (MBM).**

United States District Court, S.D. New York.

Aug. 19, 1991.

See also 708 F.Supp. 540.

Kipp Eliott Watson, New York City, for plaintiff.

James L. Garrity, Jr., Asst. U.S. Atty., New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff suffers from dyslexia and has sought unsuccessfully to be employed as a structural firefighter at the U.S. Military Academy, West Point. His application was rejected on the ground that he cannot read at a 12th grade level, a requirement West Point has imposed for hiring structural firefighters. His remaining claims arise under § 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791. He asserts that he is a handicapped individual within the meaning of the statute and applicable regulations, and that the failure to hire him constitutes disparate impact, surmountable barrier and social bias discrimination. This case was the subject of a prior opinion, reported at 708 F.Supp. 540 (S.D.N.Y.1989), familiarity with which is assumed for current purposes.

Because it appeared that under any of plaintiff's remaining theories of discrimination, assuming without deciding that all are tenable under § 501, he would have to show that he could perform the essential functions of a structural firefighter at West Point, with or without reasonable accommodation, and because his ability or lack of it in that respect seemed to be the core dispute between the parties, *see, Prewitt v. U.S. Postal Service,* 662 F.2d 292, 306–09 (5th Cir.1981) (discussing both "disparate impact" and "surmountable barrier" discrimination), that issue alone was tried in a four-day bench trial.

For the reasons set forth more fully below, and after evaluating the credibility of the witnesses and the submissions of the parties, judgment will be entered for defendant both because plaintiff failed at trial to present evidence that he is capable of meeting the reasonable requirements of a structural firefighter at West Point in spite of his handicap, and because West Point showed that the accommodations suggested by plaintiff are not reasonably possible without materially changing the job and unacceptably compromising safety.

I.

Before weighing the evidence presented at trial, it is useful to clarify what standards and burdens, particularly burdens of persuasion and of going forward with evidence, are imposed on parties to a § 501 action. "Section 501 [of the Rehabilitation Act][1] imposes on federal agencies a duty to take affirmative steps to ensure that handicapped individuals have equal access to employment opportunities in the federal government." *Treadwell v. Alexander,* 707 F.2d 473, 475 (11th Cir. 1983); *see also, Southeastern Community College v. Davis,* 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979). One practical effect of that statute and the relevant regulations thereunder[2] is that "[a]ll-

---

1. "Each department, agency, and instrumentality ... in the executive branch shall ... submit to the Civil Service Commission and to the [Interagency Committee on Handicapped Employees] an affirmative action program plan for the hiring, placement, and advancement of handicapped individuals in such department, agency, or instrumentality. Such plan shall include a description of the extent to which and methods whereby the special needs of handicapped employees are being met...." 29 U.S.C. § 791(b).

2. 29 C.F.R. § 1613.702(f): "'Qualified handicapped person' means with respect to employ-ment, a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others...."

29 C.F.R. § 1613.704: "(a) An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program.

(b) Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handicapped

though the plaintiff initially has the burden of coming forward with evidence to make at least a facial showing that his handicap can be accommodated, the federal employer has the ultimate burden of persuasion in showing an inability to accommodate." *Id.* at 478.

In this case it was necessary for plaintiff to present some evidence that he could perform the essential functions of the job and that his dyslexia, to the extent it was proved at trial, either needed no accommodation or could be reasonably accommodated. If he did so, it was then up to defendant to carry the burden of proving by a preponderance of credible evidence that it could not reasonably accommodate plaintiff's handicap. The relevant regulations specify that performance of essential functions must be accomplished "without endangering the health and safety of the individual or others," 29 C.F.R. § 1613.-702(f) (1987), and that a reasonable accommodation must be one that does not impose an "undue hardship" on the agency. 29 C.F.R. § 1613.704(a). It is against those standards that the evidence must be measured.

## II.

The firefighters employed by West Point's Division of Fire Prevention and Protection serve a facility that covers 24 square miles, with some 1000 structures occupied by about 32,000 persons during the day and 20,000 at night. In addition, approximately 2 to 3 million tourists visit the military academy every year. (Tr. 374–78) As one might expect at a training center for Army officers, the facility stores substantial amounts of ammunition of all kinds, as well as vehicle and aviation fuel. (Tr. 376–78)

West Point employs 45 people in full-time fire prevention and control, including one chief, two assistant chiefs, seven captains, 30 firefighters, four fire inspectors and a secretary, and approximately an additional 10 during the summer. The firefighters work at two locations, West Point and the Stewart Army Subpost, for most of the year, and work also at Camp Buckner during the summer.

This complement is divided into seven crews, each consisting of four firefighters and one captain. Each firefighter works three 24–hour shifts per week, with two crews assigned to Stewart and five to West Point, of which one crew alternates at Stewart as well. (Tr. 379–80)

Firefighters at West Point must read and identify words and symbols in a wide variety of emergency and non-emergency situations. In emergencies, they may be called on to read and determine the significance of numbers, words or symbols identifying the contents of buildings or vehicles. These include hazardous materials symbols identified by four-digit numbers which are listed in an extensive guidebook carried on each fire apparatus and kept also at both the West Point and Stewart fire houses, which must be consulted for appropriate procedures in case the identified material is encountered in a fire, spill or leak, or in case of exposure to the material. (Tr. 382–88) In addition, dealing with elevator emergencies could include locating the power switch for the elevator and shutting it off. (Tr. 388–89)

The regular non-emergency duties of firefighters at West Point include inspection of buildings, trains, boats and trucks for the presence of chemically dangerous, hazardous or flammable materials, and they are expected to know and read the symbols and placards identifying such materials. (Pretrial Order, p. 61 ¶ 12) In

persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.

(c) In determining pursuant to paragraph (a) of this section whether an accommodation would impose an undue hardship on the opera-

tion of the agency in question, factors to be considered include: (1) the overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's work force; and (3) the nature and the cost of the accommodation."

connection with those inspections, they must prepare reports. They must also inspect fire extinguishers. (Tr. 383–84, 387–88) They train daily in all phases of their work, and such training regularly includes written materials, both texts and manuals such as the hazardous materials guidebook referred to above. (Tr. 383–85, 389)

Apart from response to fires, inspection and training, each firefighter is required on a rotating basis to serve a tour on housewatch, either once every two weeks in the communications room at the West Point firehouse or once every fourth tour at the Stewart Army Subpost. (Tr. 393) The person assigned to housewatch answers the telephone, records information such as work schedules, incidents/calls and other firehouse activities in a daily log constituting the agency's official record of the event, and acts as the department's dispatcher. In the latter capacity he receives alarms and oversees the dispatch of firefighting equipment to the scene of a fire.

The person serving housewatch operates the nucleus of the U.S. Military Academy alarm system—a computer console which is tied to fire detection sensors and alarm boxes located throughout West Point. In addition, he operates a computerized fire equipment dispatching system and the hazardous materials management computer ("Hazmat computer"). When a fire alarm is pulled or a sensor is activated anywhere at West Point, signals are transmitted to the computer console, an alarm sounds, and information is displayed on a console screen or is printed on adding machine sized paper. That information then must be used by the person on housewatch to dispatch the appropriate equipment to the scene.

If the computer console is not operating, or if the alarm comes in by telephone or in person, the firefighter on housewatch must receive, recall and record the location and nature of the emergency, and then refer to and read printed index or rolodex cards which contain the information that otherwise would appear on the console (*e.g.,* location of fire hydrants, content of a building, presence of hazardous materials, and

the like). When necessary, the firefighter serving housewatch must be able to locate buildings on a map. (Pretrial Order ¶¶ 8–11; Tr. 324–25, 328–32, 342–43) The person assigned to housewatch frequently must stay alone in the firehouse, either during an emergency or during training exercises. (Tr. 393) Housewatch apparently is not considered a desirable duty, and accordingly housewatch is used when necessary as a disciplinary measure. (Tr. 408)

The Hazmat computer, in addition to containing the information recorded in the hazardous materials guidebook, is used as a dispatch tool; it lists hazards, water supply and other data for each building. (Tr. 394–95) If someone in the field does not have access to the hazardous materials guidebook, he must call the person on housewatch in the communications room who would assimilate the available information such as code numbers on a container or truck, feed that information into the Hazmat computer, obtain the relevant response instructions, and convey those instructions to the caller. Such activity requires that both firefighters in the field and those serving housewatch duty be able to recall, write and convey numbers accurately, often under time pressure. (Tr. 396–97) The Hazmat computer is used also during training. (Tr. 395–97)

Housewatch duty at the Stewart Army subpost requires potentially greater use of written materials than such duty in the West Point communications room because Stewart is not as fully automated as West Point. (Tr. 344–57; *compare* DX 10 A and B *with* DX 10 K)

Apart from evidence about the nature of the job of a structural firefighter at West Point, there was also evidence in the form of expert testimony about the average difficulty of written material encountered by structural firefighters at West Point, and about the importance of reading and writing to effective performance in that job. This testimony assumed particular importance because although plaintiff never explicitly conceded that he is incapable of reading significant portions of the written

material with which a firefighter must deal, or of performing housewatch, he suggested that it would be a reasonable accommodation to permit materials to be read to him by his father or by other firefighters, and to eliminate housewatch entirely for him. He suggested that the latter could be accomplished either by permitting him alone to be excused from housewatch duty, or by requiring West Point to appoint a full time dispatcher and thereby end housewatch duty for all firefighters.[3] The expert testimony, by Dr. Edward Fry, a reading specialist who has developed a recognized and accepted graph for measuring the readability by grade level of textual material, and by Dr. Joel Lefkowitz, an industrial psychologist, made it clear that even if the statute required the elimination of housewatch plaintiff suggests in the name of reasonable accommodation, a highly dubious *arguendo*, that would not eliminate the need for a firefighter to read and absorb materials at a 12th grade level and under circumstances that would not necessarily allow those materials to be read aloud to the firefighter by another person.

Fry analyzed five varieties of documents encountered regularly by West Point structural firefighters: a casualty report form, the operator's manual for the computerized alarm system in the West Point communications room, the guidebook for hazardous materials, various memoranda (known as Disposition Forms) sent to firefighters and posted in the firehouse, and printouts from the computerized alarm system at West Point. (Fry Direct Testimony,[4] Exhs. B–E) Taking the hazardous materials guidebook alone, with which a firefighter must train and which he must be prepared to use in the field if necessary, Fry's findings, which were uncontradicted and which I accept, are as follows:

"The Fry Graph was used on this material. Most of this manual contains very difficult materials. A passage in the introduction, page 'vi' on evacuation procedures, was written at the 16th grade level. The body of the manual was composed mostly of technical chemical terms like 'triflourobromomethane' and 'cryanogen', which of course are college-level chemistry terms.

"The back of this manual contains guides for handling emergencies and this [is] written at an easier level. For example, Guide 36 had key words at grade levels 6 and 8." (Fry Direct Testimony, pp. 5–6) His over-all finding was also uncontradicted, and is accepted, as follows:

"From the representative sample of documents that I have analyzed, the readability level of no document is below grade 5; most require full high school literacy and some are at the college level. It is my opinion that the documents which USMA [West Point] firefighters utilize require 12th grade reading ability, plus ability to complete specialized training in firefighting knowledge." (*Id.*, p. 8)

Lefkowitz conducted a rigorous analysis of the full range of duties of structural firefighters at West Point based on analysis of background documents, his own observations at West Point, preparation of a job analysis questionnaire in consultation with a job analysis panel drawn from firefighters and supervisors at West Point, submission of that questionnaire to 23 firefighters and supervisors, and analysis of the completed questionnaires. Lefkowitz found that some of the reading and writing requirements might be mastered by a person with "quite minimal skills," particularly relatively brief and invariant materials that conceivably could be committed to memory, thereby obviating the need for reading. "However," he continued, "the sheer volume of such 'bits' of information, in conjunction with the more voluminous

---

**3.** Plaintiff submitted as PX 92 a magazine article describing well known computer technology that can transform what would otherwise be written messages into voice messages. Such technology is frequently used, for example, by banks to route calls from their customers and allow those customers to select the banking service they wish to use. However, plaintiff introduced no evidence that such technology could be used with the devices installed at West Point, or what the cost would be of such technology.

**4.** The direct testimony of most direct witnesses was submitted in written form before trial.

sources of information (e.g. equipment and procedures manuals), renders the viability of that approach problematic." (Lefkowitz Direct Testimony, p. 8) He then went on to review the varied and voluminous documents encountered by firefighters regularly at West Point, expressed doubt that one who could not read and comprehend them could succeed as a firefighter, and analyzed as follows the suggestion that plaintiff could have materials read aloud to him:

"Although it might be possible hypothetically, to have all such materials read aloud to Mr. DiPompo, if necessary, that is probably an unreasonable imposition on co-workers and on the daily routine and work procedures." (*Id.*)

He concluded as follows:

"Finally, all of the foregoing fails to address the likelihood of unplanned or never-before-encountered reading materials which may need to be comprehended by firefighters immediately and under emergency conditions (e.g. a chemical fire) in order to maintain the safety of themselves and others. The inherently dangerous nature of an emergency firefighting situation makes it highly unlikely that co-workers could read those materials aloud to Mr. DiPompo (if that is what would be required) without significantly impairing their ability to do their jobs efficiently and safely." (*Id.*, p. 9)

▮ Plaintiff has sought to moot the concerns his dyslexia may generate by introducing into evidence the general government qualification standards for a structural firefighter, as follows:

"*Firefighter (Structural).*—Combats fires involving structures (including ships and industrial plants) and their contents except those characteristic of the Airfield specialization; rescues persons endangered by structural fires; drives motorized firefighting vehicles and operates pumping and ladder equipment." (DX 2)

He argues that this description does not include housewatch or any other task requiring reading that might be performed by a structural firefighter at West Point, and therefore that any reading task cannot be considered essential to the job of a structural firefighter. However, plaintiff has applied to serve as a structural firefighter *at West Point,* not in some abstract vicinage that may adhere to the minimum requirements of the quoted government publication. It is the job of structural firefighter *at West Point* for which he must qualify, with or without reasonable accommodation.

### III.

Plaintiff Michael V. DiPompo was 25 years old when he applied in September 1984 for a position as a structural firefighter at West Point. At the time he applied he had served for some 3000 hours over a seven-year period as a volunteer in the Beacon, New York Fire Department. (Tr. 70, 79) His great dedication and ambition are beyond question, as explicitly confirmed by the chief of the Beacon Fire Department. (Tr. 98) For example, he appears to have taken virtually every firemanship and first aid training program that became available. (PX 1–7, 9–14, 16, 18, 19, 22, 27, 30–32, 42) He also apparently served successfully at Beacon, although officers are selected by their fellow firefighters and when he stood for the position he was not selected. (Tr. 107)

One of plaintiff's volunteer colleagues at Beacon, who also serves in the New York City Fire Department, suggested that plaintiff's skill in the field, as demonstrated at Beacon, should control: "I trust Mike's skill level out in the field and that's what counts." (Tr. 292) However, plaintiff was not required as a firefighter at Beacon to keep logs or other records (Tr. 110–11), to act as a dispatcher or otherwise operate equipment in a communications room (Tr. 108, 176–77) or to operate a computer. (Tr. 111, 176–77) Indeed, there is no requirement that volunteers at Beacon show that they can read or write at any level before they are accepted as volunteers. (Tr. 174) When the Beacon fire chief, Steven Paul Van Buren, was asked to describe the essential functions of a firefighter, those functions were described entirely in terms of physical dexterity. (Tr. 86–87) It was

on that basis that he described plaintiff as having a good grasp of firefighting, which he characterized as a "reaction type business." (Tr. 84–85)

In June 1990, after this lawsuit was filed, plaintiff secured a paid position as a firefighter at the Montrose, New York Veterans Administration Hospital. (Tr. 112) That facility includes about 800 patients and a staff of 1500. (Tr. 257) Although plaintiff testified that he was able to perform inspections and to fill out the inspection forms by finding "my own reasonable accommodations on my own" (Tr. 121–23), apparently by having his father look up code violations when necessary (Tr. 125), the Montrose fire chief, John MacCormack, testified that plaintiff had "a hard time" and required assistance with the inspection form (Tr. 267–68; PX 132), even when there was little or no time pressure. Mac-Cormack had visited the West Point facility, and testified that it was "a lot more sophisticated" than Montrose. (Tr. 268–69) Although plaintiff testified that he was trained at Montrose in dealing with hazardous materials, MacCormack testified that Montrose would call on a county unit to deal with a hazardous materials emergency. (Tr. 264–65) There is no equivalent at Montrose to the housewatch duty at West Point. (Pretrial Order p. 63, ¶ 24)

The degree of plaintiff's dyslexia was the subject of some dispute at trial, and plaintiff averred that he reads "under a fourth grade level, approximately." (Tr. 112) However, I credit the testimony of Dr. Eric R. Brown, a clinical professor of neurology at New York University School of Medicine and Director of Clinical Neuropsychological Services at the school, who is a reading specialist and an expert who has written on the subject of dyslexia. He placed plaintiff's reading level at late first grade to early second grade (Brown Direct Testimony p. 10), and concluded that the limit of plaintiff's short term recollection of digits is five forward and three reverse. (*Id.* at p. 6) The latter impediment could pose obvious dangers in a situation where plaintiff is called upon to repeat a telephone number, an address, or the identification code of a hazardous chemical.

Dr. Richard Hobler, a clinical psychologist at the Veterans Administration Medical Center in Castle Point, New York, who testified as an expert for plaintiff, concededly is not an expert in reading or dyslexia. (Tr. 194) Even he placed plaintiff's reading level at the third to fourth grade level. (Tr. 184)

Although plaintiff sought in his own testimony to minimize the effect of his dyslexia, his testimony as to how he dealt with the written material he said he had mastered made it clear that he did not read such material. Repeatedly, his counsel put questions and he responded in terms of whether he was able to "acquire information" from such material or "use" or "rely on" written material. Notable by its absence was any testimony that plaintiff had "read" the material he was being questioned about. (Tr. 37, 44, 47, 52, 57, 60, 65, 67, 68, 69, 477–78) From this carefully phrased testimony and the testimony of Drs. Brown and Hobler, I conclude that, as plaintiff conceded in one instance, such material was read to him by others including his father. (Tr. 38)

■ Plaintiff presented the written testimony of a retired Deputy Chief of the New York City Fire Department, George Friedell, who also teaches fire science at the City University, who reviewed plaintiff's recommendations and took the view that plaintiff's dyslexia required only a "small accommodation" which "would be more than balanced by the far above average qualifications shown by his record, his desire to be a firefighter and his willingness to strive for that which he wants to be." (Friedell Direct Testimony ¶ 5) However, nothing in that testimony shows that the witness knew anything about procedures at West Point, or indeed had ever met plaintiff. Such testimony is entitled to only minimal weight.

■ Notwithstanding plaintiff's accomplishments as a firefighter thus far, particularly as a volunteer at Beacon, and his demonstrated dedication to his chosen field, it is clear that plaintiff would be unable to deal with the written materials used by West Point firefighters on a day-to-day ba-

sis in their training, inspection and response to emergencies, and would be entirely unable to perform housewatch duties. It is also clear that these disabilities, and his difficulty in recalling more than five digits at a time, could pose a significant danger to others and to himself in emergencies which are the main reason for the existence of a fire department.

## IV.

As noted above, notwithstanding that § 501 of the Rehabilitation Act and the regulations thereunder obligate the federal government to "take affirmative steps to ensure that handicapped individuals have equal access to employment opportunities in the federal government," *Treadwell*, 707 F.2d at 475, plaintiff nonetheless must come forward with "evidence to make at least a facial showing that his handicap can be accommodated...." *Id.* at 478. This plaintiff has failed to do. He has suggested that housewatch duty be eliminated, either by excusing him from performing it or by hiring a full time dispatcher. However, to impose such a requirement on the West Point facility would require a major restructuring of the job of firefighter, without regard to effect on morale or expense. I do not read the statute or the regulations as imposing such a requirement. *Gardner v. Morris*, 752 F.2d 1271, 1280 (8th Cir.1985); 29 C.F.R. § 1613.704(a).

Moreover, even if elimination of housewatch were required despite the possible damage to morale that would result from one firefighter being excused from a duty considered sufficiently burdensome that it is used as a disciplinary measure (Tr. 438–39), or despite the added expense of the full time dispatcher alternative with resulting increase in pressure on all firefighters if the total number of firefighters were reduced so that a dispatcher could be hired (Tr. 405–06), the evidence still shows that plaintiff could not engage in routine training, inspection and response to emergencies using necessary materials, including the hazardous materials handbook. Requiring another firefighter to read the material to him is simply not a reasonable accommodation. Nor, as set forth above (p. 892, *supra*), can I limit plaintiff to showing that he meets minimum criteria in a government publication drafted without regard to the particular features of the actual job for which he is applying. For these reasons, plaintiff has failed to present any evidence that his handicap can be reasonably accommodated, or that he can do the job without accommodation.

Alternatively, defendant has met its burden of showing that even giving plaintiff the benefit of any accommodation he has suggested, his dyslexia still could not be accommodated without obvious and unacceptable safety risks to persons and property at West Point, to other firefighters, and to plaintiff himself. In this connection, plaintiff has argued that the standard the government must meet is the one set forth in *Mantolete v. Bolger*, 767 F.2d 1416, 1422 (9th Cir.1985): "whether, in light of the individual's work history and medical history, employment of that individual would pose a reasonable probability of substantial harm." Assuming without deciding that that is consistent with 29 C.F.R. § 1613.-702(f), which requires that the handicapped person be one who "can perform the essential functions of the job without endangering the health and safety of the individual or others," and is otherwise a correct statement of the applicable standard, it does not help plaintiff here. The "reasonableness" of the probability necessarily must include some evaluation of the job itself and its setting. What may be a reasonable risk for a postal worker, as in *Mantolete*, whose job generally does not pose great hazards to those who perform it or to the public they serve, is not necessarily a reasonable risk for a firefighter, whose job is defined at almost every turn by the potential for disaster to himself and others.

For the above reasons, which shall constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), judgment will be entered for defendant and the complaint dismissed.

SO ORDERED.