John **HUBER**

v.

**HOWARD COUNTY, MARYLAND.**

Civ. No. K–93–606.

United States District Court,
D. Maryland.

April 15, 1994.

Francis J. Collins, Baltimore, MD, for plaintiff.

Barbara M. Cook, County Sol. for Howard County, Richard E. Basehoar and Rebecca A. Laws, Sr. Asst. Sols. for Howard County, Ellicott City, MD, for defendant.

FRANK A. KAUFMAN, Senior District Judge.

John Huber brings this suit under the Rehabilitation Act, 29 U.S.C. § 794, claiming that Howard County, Maryland, unlawfully discriminated against him when the County refused to hire Huber as a full-time firefighter because he suffers from asthma. For the reasons stated herein, this Court concludes that there are no material and relevant disputes of fact, and that, as a matter of law,

Huber is not an otherwise qualified individual within the meaning of the Act, nor did the County unreasonably fail to accommodate Huber's disability. Accordingly, this Court grants the County's pending motion for summary judgment.

## FACTS

In Howard County, Maryland, firefighting services are provided by both volunteer fire corporations and career employees of the County's Department of Fire and Rescue. Volunteer firefighters are not required to meet all the requirements established for career firefighters or to participate in County sponsored training or testing. Rather, they may choose to limit the functions which they perform during a fire emergency.

Huber applied and was accepted for membership in the Ellicott City Volunteer Fireman's Association, Inc. in March of 1986, and in the West Friendship Volunteer Fireman's Association, Inc. in February 1987. Both of those non-profit, non-stock corporations are located in Howard County. As a volunteer firefighter, Huber successfully completed several training courses and also became certified as a cardiac rescue technician.

On March 30, 1989, Huber applied for the position of firefighter recruit with the County's Department of Fire and Rescue Services. Firefighter recruits attend an eighteen week fire academy conducted by that Department, after which they are called upon to complete a one year probationary period before being admitted to a career firefighter position. On November 11, 1989, as part of the individualized medical examination required of all firefighter recruit candidates, Mr. Huber reported to an examining physician hired by the County that he had a history of "childhood" asthma and that he used an inhaler; nonetheless, the County doctor recommended Huber for hire. Huber began employment as a firefighter recruit on February 12, 1990.

As a firefighter recruit, Huber was required to participate in a training academy which had a physical fitness training program as one of its component parts. Male firefighter recruits were expected to run 1.5 miles in under 13 minutes. While a recruit's failure to meet the entry level standards in any one exercise did not necessarily result in the recruit's disqualification, all recruits were required to pass a final agility test at the conclusion of the academy in order successfully to complete the recruit training program. Although firefighters are instructed not to run at the scene of a fire, the running exercises are meant to ensure that firefighters are physically fit to assume the demanding tasks otherwise required of them, such as pulling hoselines, throwing and raising ground ladders, opening holes in roofs and walls using an axe, gaining entry through a locked door, operating heavy duty extrication tools, and participating in salvage operations.

During physical training classes at the academy, Huber had difficulty performing several of the running exercises. On February 14, 1990, Huber had to use an inhaler/bronchodilator to assist his breathing during an exercise. Subsequently, he was referred for an additional medical examination, and on February 16, 1990, an internist issued a report stating that Huber appeared fit to undertake the physical stress of a firefighter's job, but suggested further evaluation in the light of Huber's performance problems during running exercises. On February 19, 1990, during physical training exercises, Huber failed to finish the 1.5 mile run in 13:00 minutes, taking instead 13:02 minutes. On February 22, 1990, Huber again experienced difficulty in the running exercise, had to use his inhaler, and told his instructor that he "didn't want to bring on anything" and that "I can't run the pace in cold weather so I slow down and continue running."

On that latter date, the County's Office of Personnel required Huber to report to his treating physician for an examination and asked that the physician provide an opinion as to whether Huber could perform firefighting work in an environment in which Huber was exposed to a variety of adverse conditions. On February 27, 1990, the physician responded to the County's questionnaire, stating that Huber could not perform the duties of a firefighter without medication to control his asthmatic condition. That physician also wrote that Huber "most likely" could perform firefighter duties with medication, but that "if there is any further ques-

tion regarding his capability—perhaps an evaluation by a pulmonologist or allergist would be appropriate."

On February 28, 1990, Huber was advised that he could not carry his inhaler during work hours. That day, Huber took 14:14 minutes to finish the 1.5 mile run, and the next day he had to stop running after one mile, telling his instructor that his legs hurt but that he had no trouble breathing. On March 5, 1990, Huber stopped running, stating that he needed to clear his lungs, and on March 6, 1990, he stopped running during an exercise and ended up finishing eight minutes slower than the average class time. During the physical training at the academy, other recruits also from time to time had difficulty completing the 1.5 mile run in the 13:00 time.

On March 1, 1990, the County referred Huber to the Director of Pulmonary Diseases at Maryland General Hospital, Dr. Michael G. Hayes, who examined Huber on March 2, 1990. Dr. Hayes subsequently wrote to the County recommending that Huber not be hired as a firefighter based upon the risk Huber would pose to himself and others with whom he would work. Dr. Hayes explained in an affidavit that given the demands on firefighters at the scene of a fire—rapidly fluctuating temperature conditions, work at or near maximal heart rates, and exposure to toxic substances—there is no medical plan which, if followed by Huber, would enable him to serve without a risk of future harm to himself or others.

On March 12, 1990, the County wrote to Huber, telling him that his employment would be terminated pursuant to Howard County Code Section 110(d)(4)(b) which provides for dismissal of an employee who has some permanent or chronic physical or mental ailment or defect which incapacitates him from the proper performance of his duties. Huber was afforded a hearing prior to dismissal before the Director of the Department of Fire and Rescue Services, following which the Director filed charges of dismissal with the County's Personnel Officer requesting that Huber be discharged from employment. On March 19, 1990, the County's Personnel Officer advised Huber of his dismissal and of his rights of appeal. Huber did not file an appeal, and his termination became effective on March 23, 1990. Huber has continued his membership with the West Friendship Volunteer Fireman's Association, Inc. and currently works as a cardiac rescue technician/driver. Since his dismissal, Huber has been seen at least nine times by doctors for breathing problems and has been hospitalized for such problems on at least two of those occasions.

In this case, Huber has brought suit in federal district court against the County pursuant to section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, claiming that the County unlawfully discriminated against him when it refused to accommodate his disability.[1] The County responds that plaintiff does not have a disability as defined under the Act, that it did not refuse to accommodate Huber, that Huber's condition could not be reasonably accommodated with medication, and that it did not act willfully and wantonly against Huber or discriminate against him. Defendant has moved for full summary judgment, and plaintiff has moved for partial summary judgment with respect to liability.

As set forth in Fed.R.Civ.P. 56(c), summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." " 'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir.1967), *cert. denied*, 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968)). In the absence of such a minimal showing, a party moving for summary judgment should not be required to undergo the expense of preparing for and participating in a trial of the issue challenged. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

1. Prior to the Rehabilitation Act Amendments of 1992, Pub.L. No. 102–569, 106 Stat. 4344, 4360, the Rehabilitation Act referred to "handicapped" individuals rather than individuals "with a disability."

242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The burden is on the party moving for summary judgment to show that no genuine issue of fact exists and that the movant is entitled to judgment as a matter of law. *Barwick v. Celotex*, 736 F.2d at 958. The facts and the inferences to be drawn from the facts must be viewed "in the light most favorable" to the nonmoving party. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985). Nevertheless, the Fourth Circuit has stated that, with regard to motions for summary judgment, trial judges have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (quoting *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53).

### THE REHABILITATION ACT

■ The Rehabilitation Act provides that: "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C.A. § 794 (West Supp.1993).[2] Claims under the Rehabilitation Act are evaluated under the following proof scheme:

First, plaintiff must demonstrate that she is 'handicapped' within the meaning of the Act and pertinent regulations. Second, plaintiff must demonstrate that she is 'otherwise qualified' for the position at issue, see 29 C.F.R. § 1613.702(f) ... and that she was excluded or discharged from the position solely because of that handicap. These two showings constitute the prima facie case. Third, if plaintiff satisfies her

burden of demonstrating qualification under the Act, the burden shifts to defendant to show that the justifications offered for its refusal to accommodate plaintiff are 'job related' and that to make the necessary accommodation would impose an 'undue hardship' on its operations.

*Walders v. Garrett*, 765 F.Supp. 303, 308 (E.D.Va.1991) (citations omitted), *aff'd* 956 F.2d 1163 (1992).

### *Disabled Person*

The Rehabilitation Act defines a disabled person as one who "has a physical or mental impairment which substantially limits one or more of such person's major life activities." 29 U.S.C. § 706(8)(B)(i). Major life activities include "functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, *breathing*, learning, and working." 29 C.F.R. § 1613.702(c) (emphasis added). Because asthma effects Huber's ability to breathe, it is well within the Regulation's definition of a handicap. *See Carter v. Tisch*, 822 F.2d 465 (4th Cir.1987) (assuming, without expressly deciding, that asthma is a handicap).

However, the Fourth Circuit, and other circuits, have also required that the courts make an individualized inquiry of "whether the particular impairment constitutes for the particular person a significant barrier to employment." *Forrisi v. Bowen*, 794 F.2d 931, 933 (4th Cir.1986). In making that determination, the Court considers " 'the number and type of jobs from which the impaired individual is disqualified, the geographical area to which the individual has reasonable access, and the individual's *job expectations*.' " *Id.* at 933 (quoting *Jasany v. United States Postal Service*, 755 F.2d 1244, 1249 (6th Cir.1985)) (emphasis added).

**2.** In a Memorandum and Order dated August 4, 1993, attached hereto and made a part hereof, as Appendix A, this Court held inter alia that the Howard County Department of Fire and Rescue Services received federal financial assistance during the time period in which plaintiff was employed by the County's Department of Fire and Rescue Services, and that therefore the Rehabilitation Act applies to plaintiff's claims. In that same Memorandum and Order, this Court

also decided a limitations defense asserted by defendant, dealt with the handling of certain damages issues, called for further development of the record, factually and legally, which counsel have so done, and set forth certain procedures concerning plaintiff's jury trial demand. The Court's said comments with regard to that jury demand were made without the benefit of the Fourth Circuit's opinion in *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823 (4th Cir.1994).

■ In this case, it is not disputed that Huber performs ably as a volunteer fire fighter. His certification as a cardiac rescue technician further demonstrates that various jobs other than a career firefighter are open to him, and that those jobs are in related fields to firefighting. Thus, Huber's condition does not substantially limit his employment opportunities in general. However, because Huber is disqualified from advancing the firefighting career for which he is well trained, and in which he has extensive background, his disability is substantially limiting as to being a career firefighter as such. Although a person's inability to fulfill one narrow job classification because of a physical or mental impairment does not constitute a disability, see *Forrisi*, 794 F.2d at 934, inability to perform specific job duties substantially limits a person's employment opportunities as to a job calling for performance of those duties. Such a person may have to seek a different job, even if that calls upon him to alter his career path and/or to once again start at the bottom of the ladder. In that context, Huber has a disability which prevents him from performing the duties of a firefighter and is a disabled person as defined by the Rehabilitation Act.

■ In any event, regardless of whether or not he is disabled, Huber, as part of his prima facie case, must establish that he is an otherwise qualified disabled individual, i.e., "a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others...." 29 C.F.R. § 1613.702(f). Whether Huber is "otherwise qualified" depends first upon, whether Huber can meet the "essential functions" of a firefighter, and second, whether the County's requirements appropriately measure those functions. *Pandazides v. Virginia Board of Education*, 946 F.2d 345, 349 (4th Cir.1991).

The County asserts that Huber cannot fulfill the essential functions of a firefighter because, as Dr. Hayes concluded, Huber's asthma poses the risk that he may be incapacitated at the scene of a fire when confronted in an outdoor environment with a variety of allergens, variable weather conditions, including cold weather, and hazardous and toxic fumes and substances. Huber does not contest .Dr. Hayes' assessment of the risks involved in firefighting, but responds that he is otherwise qualified because he can and has performed the functions of a volunteer firefighter for eight years.

■ However, the position of a volunteer firefighter differs in several important ways from that of a career firefighter. To begin with, the volunteer corporations are funded separately from the County department and have their own membership standards. Most importantly, unlike County firefighters, volunteer firefighters have the discretion of not responding to a fire and Huber has stated in depositions that he has, on numerous occasions, declined from going on calls because he was not feeling well. Career firefighters simply do not have that discretion. Finally, Huber's performance as a volunteer is not necessarily indicative of his future performance given the unpredictable nature of asthma, which in Huber's case, according to his own expert, is cold and exercise induced, conditions which are faced by firefighters. Huber simply may not impose the standards of a volunteer firefighter upon the County in the light of the differences between the two jobs. Rather, he must demonstrate that he is qualified to serve in the *specific job* at issue. See *DiPompo v. West Point Military Academy*, 770 F.Supp. 887, 892 (S.D.N.Y.1991), *aff'd* 960 F.2d 326 (1992); *Walders*, 765 F.Supp. at 313.

As to the second level of the "otherwise qualified" inquiry, whether the employer's requirements are representative of the essential functions of the job, this Court concludes that the County's requirement that firefighters not have a chronic medical condition such as Huber's is directly linked to the duties which inhere in the position of a County firefighter. In *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1135–36 (4th Cir.1988), plaintiff, an individual with a history of back problems, sued under 42 U.S.C. §§ 1981, 1982, and 1983 claiming that he was unlawfully discriminated against on the basis of race when he did not receive a position as a volunteer firefighter. The jury found for the defendant, and the Court, uti-

lizing the standards of the Rehabilitation Act, stated that the jury's verdict was supported by overwhelming evidence that the plaintiff was not physically suited to be a firefighter. In the case now before us, the uncontradicted evidence in this record, as did the evidence in *Mullen,*

> serves only to confirm a fact that is self-evident—firefighting is strenuous, hazardous, demanding work. [Firefighters] must wear heavy protective gear in fighting fires, and are often required to lift heavy loads. Dependable firefighting services are crucial to the public, and the danger involved in the work requires that each firefighter be confident in the abilities and stamina of his fellow workers. Firefighting is simply a job for which physical fitness is a most basic qualification.
>
> ... Some conditions simply are not compatible with certain lines of work.

*Id.* at 1135–36. Huber has not provided or even proffered evidence that he can perform a most essential function of a career firefighter, namely to be available, in a healthy physical condition at any, random moment during a shift—"in spite of his handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). Thus, in terms of the Act, Huber is not "otherwise qualified" unless his would-be employer can reasonably accommodate him in the performance of the job.

### Reasonable Accommodation

■ A disabled individual may be qualified under the Act if provided by his employer with reasonable accommodation in the handling of his disability. Thus, the question arises as to whether Huber can perform the essential functions of a firefighter with such accommodation and if so, whether the County has failed reasonably to accommodate him. "[P]laintiff bears the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation." *Walders,* 765 F.Supp. at 312 (citations omitted). While plaintiff has produced evidence that he could perform most of the essential functions of the job with accommodation by the County, he has not shown that the type of accommodation which would be necessary would also be reasonable.

Huber states that the County failed to accommodate him when it denied him use of his inhaler during exercises at the academy. However, an exhibit provided by Huber, apparently from a Physician's Desk Reference, states that his brand of inhaler should not be used or stored near open flame and that exposure to high temperatures could cause bursting of the device. In the light of these facts, the County has not acted unreasonably in determining that such device would be improper if used at the scene of a fire. Further, Huber does not contest the fact that, in denying Huber use of his inhaler during exercises, the County was concerned with how a firefighter, at the scene of a fire, would use an inhaler, given the breathing apparatus, helmet, facepiece and gloves a firefighter wears, and that the County was also concerned with how long it would take for such medication to have effect. Thus, Huber has provided no evidence that the County's direction regarding the inhaler was not job related or supported by legitimate safety concerns; rather, the opposite appears true. "An employer is allowed to consider potential safety risks to applicants co-workers, and others in making a decision about employment criteria." *Serrapica v. New York,* 708 F.Supp. 64, 73 (S.D.N.Y.1989), *aff'd* 888 F.2d 126 (1989).

Beyond the medication controversy, Huber has provided the opinion of Dr. James L. Gamble, a specialist in occupational medicine, who states that Huber could perform the duties of a firefighter with several accommodations, above and beyond permitting use of the inhaler. According to Dr. Gamble, the County could have other firefighters, who are trained to use a stethoscope, evaluate Huber on a daily basis to determine whether he is having a wheezing problem, and if he is having a problem he could be referred to the fire department's medical department for further determination of his work status. At the scene of a fire when the firefighters report for rehabilitation, the paramedics on sight could listen to Huber's lungs to see if there is a wheezing problem. Again, if he is found to have a problem he could report to

the firefighter's medical department. Dr. Gamble states that with those accommodations, the risk of any sort of problem would be less than ten percent.

 However, an employer need not make accommodations which "would result in an undue hardship," to the employer. *Walders*, 765 F.Supp. at 313. The accommodation urged by Huber would appear to add up to just that. To begin with, contrary to Dr. Gamble's assumption, the County fire department has no on-site medical department or rehabilitation center, and commonsense suggests that establishing and maintaining such departments to accommodate plaintiff would entail substantial cost. Moreover, the fact that plaintiff's lungs are clear at the start of the day would not guarantee that Huber's lungs would remain clear at the scene of a fire or at any other time during a work shift. Even if Huber were further examined at the site of a fire, his potential incapacitation could require that he be removed from service. That contingency would mean that the County would have to increase its staffing requirements at stations to which Huber is assigned in order to have enough active firefighters at the scene. An accommodation which permits an employee to work only when his or her impairment permits is not reasonable in a job, such as firefighting, where active attendance and immediate, undelayed participation is crucial. *See Walders*, 765 F.Supp. at 310 ("[P]laintiff's supervisors could not count on her attendance or predict her absences. In these circumstances, plaintiff could not effectively perform her job functions.").

Huber's requested accommodation would also pose an undue burden upon the County in the light of the fact that the County provides only one day of disability leave a month, which experience has shown will not be enough to accommodate Huber. During training as a recruit, Huber was often incapacitated for several days within a single month. Providing Huber with extra disability days would affect staffing and hours of the other firefighters.

It bears repeating that the applicable regulation defines an otherwise qualified person as one who, with or without reasonable accommodation, does not pose a safety or health risk to others. Numerous cases have held that an individual who is at risk of danger to himself or others is not otherwise qualified. For instance, in *DiPompo*, 770 F.Supp. at 887, a plaintiff who suffered from dyslexia sought to be employed as a firefighter at the U.S. Military Academy. The job required reading and identifying words and symbols in a wide variety of emergency and non-emergency situations, a requirement with which plaintiff could not comply. Because his disabilities "could pose a significant danger to others and to himself in emergencies," the court concluded that DiPompo could not perform the essential functions of the job. *Id.* at 894. *See also Ward v. Skinner*, 943 F.2d 157 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1558, 118 L.Ed.2d 207 (1992) (epileptic taking anticonvulsant medicine is not otherwise qualified to drive commercial vehicles even though risk may be small); *Serrapica*, 708 F.Supp. at 72–73 (insulin-dependant diabetic not otherwise qualified to operate a sanitation truck); *Davis v. Meese*, 692 F.Supp. 505, 518–19 (E.D.Pa.1988), *aff'd* 865 F.2d 592 (1989) (insulin-dependent diabetic not otherwise qualified for a job with the FBI as a special agent or investigative specialist); *Salmon Pineiro v. Lehman*, 653 F.Supp. 483, 493 (D.P.R. 1987) (plaintiff who suffers seizures not otherwise qualified for job of criminal investigator with Naval Investigative Services where job involves use of firearms, apprehension of suspects, and surveillance under stressful conditions). Dr. Gamble, Huber's own proferred expert witness, states that even with the suggested accommodation, Huber would pose a ten percent risk of danger to himself or others, and that expert view does not address the risks which would be involved if Huber could not use or access his inhaler at the scene of a fire. Thus, even evaluating the evidence in the light most favorable to Huber, it would appear that, at the very most, with some accommodation, Huber could perform as a firefighter on many occasions, but not all of the time. In the life and death circumstances facing firefighters, the County does not have to assume such a ten percent risk even disregarding Huber's re-

quested, and potentially costly, accommodation.

Huber's enthusiasm, sincerity, and commendable desire to serve his community, as well as the competent work he has done as a volunteer firefighter, all deserve to be noted and taken into account. But the Rehabilitation Act and its ensuing caselaw provide that the County need not accommodate Huber's disability where so to do would result in an undue burden for the County and a risk of harm to Huber himself, to his fellow firefighters, and to the general public. Accordingly, the County is entitled to the summary judgment which it seeks.

## MEMORANDUM AND ORDER
### ON MOTION TO DISMISS

(1) On July 30, 1993, this Court held an on-the-record hearing in open court. For the reasons discussed during that hearing, Defendant's Motion to Dismiss, or, in the Alternative, for Summary Judgment, and Defendant's Motion to Strike Request for Jury Trial, filed April 8, 1993, are DENIED.

■ (2) Specifically, defendant argued that § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, does not apply to the within case because the Howard County Department of Fire and Rescue Services, by which plaintiff was employed and discharged, did not receive federal financial assistance. However, the County Office of Emergency Management and Civil Defense, which is a part of the County Department of Fire and Rescue Services, did receive federal financial assistance during the time period in which plaintiff was employed by the Department of Fire and Rescue Services. Moreover, the salary of Richard Shaw, who served both as the Director of the Department of Fire and Rescue Services and as the Director of the Office of Emergency Management and Civil Defense, was partially funded by federal money. While the receipt of federal financial assistance by one department or agency of a county does not render the entire county subject to the provisions of § 504, and while such assistance to one department does not subject another department to the requirements of § 504, if one part of a department receives federal financial assistance, the whole department is considered to receive federal assistance so as to be subject to § 504. *See e.g. Schroeder v. City of Chicago,* 927 F.2d 957, 962 (7th Cir.1991); *Tanberg v. Weld County Sheriff,* 787 F.Supp. 970, 974 (D.Colo.1992). As this Court finds that the Department of Fire and Rescue Services received federal financial assistance during the time of plaintiff's employment and discharge, Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment on this ground is denied.

■ (3) Defendant also argued that the six months limitation period found in Article 49B of the Maryland Annotated Code should be applied in this case, as that statute is most analogous to the Rehabilitation Act. Defendant further contended that, applying that six months limitation period, plaintiff's claim is barred as plaintiff was discharged on March 19, 1990, but did not file the complaint in the within case until February 25, 1993. As discussed during the aforementioned hearing, this Court concludes that Maryland's general three-year limitation period for civil actions applies to claims under § 504. *See Jones v. Frederick County Bd. of Educ.,* 689 F.Supp. 535 (D.Md.1988); *Cf. Burnett v. Grattan,* 468 U.S. 42, 50, 104 S.Ct. 2924, 2930, 82 L.Ed.2d 36, 45 (1984) (applying six months limitation period from Article 49B to action brought in a federal court under the Reconstruction-era Civil Rights Acts, 42 U.S.C. §§ 1981 et seq., is not appropriate in view of differences between the administrative proceeding contemplated by Article 49B and a civil action in a federal court). Thus, plaintiff's claim is not barred by limitations, and Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment on this ground is denied.

■ (4) Defendant asserted that compensatory damages for pain and suffering, mental anguish, humiliation, or embarrassment, and punitive damages are not available under the Rehabilitation Act. Defendant further contended that as only equitable relief is available, plaintiff has no right to a jury trial.

In *Eastman v. Virginia Polytechnic Institute,* 939 F.2d 204 (4th Cir.1991), the Fourth Circuit held that compensatory damages for

pain and suffering and punitive damages are not recoverable under § 504 of the Rehabilitation Act. In the course of its opinion, the Fourth Circuit analogized actions under § 504 to actions under Title VI and Title VII, concluding that Title VII "has consistently been limited to allow only equitable relief" and inferring legislative intent from that, and concluding that Title VI and § 504 should be similarly limited. *Id.* at 208. The Fourth Circuit noted the decision of the Eighth Circuit in *Miener v. State of Missouri,* 673 F.2d 969 (8th Cir.), *cert. denied,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982), which concluded that § 504 does permit a broad range of compensatory damages, and which proceeded from the proposition that "the existence of a statutory right implies the existence of all necessary and appropriate remedies." *Miener,* 673 F.2d at 977 (quoted in *Eastman,* 939 F.2d at 207). However, the Fourth Circuit did not follow *Miener.*

Subsequent to the Fourth Circuit's decision in *Eastman,* the Supreme Court decided the case of *Franklin v. Gwinnett Cy. Pub. Schools,* — U.S. —, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), in which the Court held that a money damages remedy is available for an action brought under Title IX, based, in part, on the presumption in favor of the availability of any appropriate relief for violation of a federal right. In so doing, the Court discussed the similar treatment of Title IX, Title VI, and § 504. Further, the Court, in discussing its prior decision of *Guardians Assn. v. Civil Service Comm'n. of New York City,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), commented: "Though the multiple opinions in Guardians suggest the difficulty of inferring the common ground among the Justices in that case, a clear majority expressed the view that damages were available under Title VI in an action seeking remedies for an intentional violation, and no Justice challenged the traditional presumption in favor of a federal court's power to award appropriate relief in a cognizable cause of action." *Franklin,* — U.S. at —, 112 S.Ct. at 1035, 117 L.Ed.2d at 220. Section 504 expressly incorporates the "remedies, procedures, and rights set forth in title VI." 29 U.S.C. § 794a(a)(2).

In that context, during the July 30, 1993 proceeding, this Court proposed, and both counsel agreed upon, the following procedure: At trial, this Court will use a jury to hear and evaluate evidence of compensatory and punitive damages and render special verdicts pursuant to Federal Civil Rule 49(a). However, this Court will also make its own independent determinations, but may utilize the jury's verdict as advisory. If the jury's verdict is different than this Court's, this Court will utilize its own verdict, and will not permit damages other than back pay. *See Eastman, supra; Turner v. First Hosp. Corp. of Norfolk,* 772 F.Supp. 284, 288 (E.D.Va.1991); *Tull v. United States,* 481 U.S. 412, 416–17, 107 S.Ct. 1831, 1834–36, 95 L.Ed.2d 365, 372–73 (1987). If either party desires to appeal in that regard, such party will have that opportunity, if that opportunity is timely and otherwise appropriately so exercised.

(5) During the aforementioned hearing, this Court raised the issue of whether plaintiff was "otherwise qualified." Specifically, this Court raised the comparison between this case and the case of *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3rd Cir.1991), cited by plaintiff in this case, in which the plaintiff in that case was considered to be "otherwise qualified," as defendant, the educational institution in that case, had allowed her to matriculate twice "without indicating at any time that Nathanson's [plaintiff's] physical problems would interfere with her ability to be a qualified medical student or physician." *Id.* In the within case, plaintiff asserts that he had been a volunteer employee for three years before his hiring and discharge by the Department of Fire and Rescue Services and that he has continued as a volunteer employee for the past three years after his discharge. In that context, this Court put three factual questions to counsel: 1) Are the duties of a volunteer employee of the Department of Fire and Rescue Services, specifically the duties of plaintiff, the same as the duties of a permanent employee? What are the differences, if any? 2) What specifically occurred at the academy regarding the physical performance exercise which defendant alleges plaintiff "failed," and why is plaintiff consid-

ered to have so failed? 3) What is the specific reason defendant gives for discharging plaintiff?

(6) During the hearing, this Court directed that all formal discovery be frozen and that counsel get together and enter into factual stipulations and informal discovery to the fullest extent possible. It was agreed that counsel would file a status report detailing the same and any formal discovery which they seek, by September 17, 1993. This Court will then decide what, if any, formal discovery is needed. It was further agreed that any discovery would be completed by December 1, 1993. All motions shall be filed by January 10, 1994, with responses due by January 24, 1994, and rebuttals, if any, due by February 4, 1994. A pre-trial conference is set for February 21, 1994 at 4:00 p.m. Trial, tentatively a 2–3 day jury trial, is set to begin at 10:00 a.m. on March 14, 1994.

(7) Copies of this Memorandum and Order are today being mailed to counsel of record.

(8) IT IS SO ORDERED this 4th day of August, 1993.